236 P.3d 421

**DESERT MOUNTAIN PROPERTIES LIMITED PARTNERSHIP, Plaintiff/Appellee/Cross–Appellant,**

v.

**LIBERTY MUTUAL FIRE INSURANCE COMPANY, Defendant/Appellant/Cross–Appellee.**

No. 1 CA–CV 08–0802.

Court of Appeals of Arizona, Division 1, Department D.

Aug. 3, 2010.

David Bell & Associates, PLLC By David M. Bell, Howard L. Andari, Phoenix, Attorneys for Appellant/Cross–Appellee.

Fennemore Craig By J. Randall Jefferies, Louis D. Lopez, Phoenix, Attorneys for Appellee/Cross–Appellant.

## OPINION

JOHNSEN, Judge.

¶ 1 Soil settlement caused cracks and other damage to 50 new homes in north Scottsdale. Prompted by complaints from customers to whom it had sold the homes, the developer, Desert Mountain Properties Limited Partnership, paid an average of $200,000 per home to have the soil issues corrected and the damage repaired. Desert Mountain then sought reimbursement from its insurer. We hold in this appeal that commercial general liability policies issued by Liberty Mutual Fire Insurance Company covered the expenses Desert Mountain incurred in repairing property damage resulting from the soil settlement. We also affirm the jury's conclusion that Liberty Mutual was obligated to indemnify Desert Mountain for those expenses even though none of the homeowners had sued Desert Mountain over the damage to their homes.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Desert Mountain contracted for the construction of hillside homes in two subdivisions, the Sonoran Cottages and the Sonoran Cottages Enclave.[1] The general contractor, The Weitz Company, completed the homes in 1995. From the outset, some of the homes experienced settlement and drainage problems and patio cracks. In October 1999, Desert Mountain learned of a home in the Enclave that had experienced such significant settlement that the patio had sunk two to three inches, retaining walls had rotated and cracks had appeared in the roof and interior walls. Desert Mountain hired a consultant, Joe Frank, to examine the property. After receiving other complaints of cracks in interior walls, patio slabs and retaining walls throughout 2000, the company asked Frank to expand his investigation to all 50 properties.

¶ 3 Frank concluded there was "a very substantial soils issue involving the poor compaction of fill material" on which the homes had been built. Poor soil compaction had caused floor slabs to shift, resulting in cracks and other damage, and water infiltration had exacerbated the matter. Frank's investigation also revealed other construction defects, including defectively installed water and sewage lines that allowed additional moisture to enter the poorly compacted fill. Ultimately, all 50 homes required repairs of varying degree. Areas of poorly compacted soil needed to be treated with pressurized grouting. To identify those areas, workers needed to drill through concrete floor slabs to test subsurface soil densities. More holes then would be drilled, through which workers would pump pressurized grout (a mixture of cement and water) to stabilize the soil. After this work was completed, cracks in floors and walls would be repaired, drainage systems would be repaired and patio slabs and tile floors would be replaced.

¶ 4 On May 16, 2001, Desert Mountain sent a notice of claim to Liberty Mutual. It sought coverage of damages to the Cottages and Enclave homes pursuant to one-year commercial general liability ("CGL") policies issued on August 29, 1999 and November 11, 2000.[2] In its letter, Desert Mountain explained it already had spent $640,000 in repairs and that more repairs needed to be made.

¶ 5 In a response dated May 31, William Strickland, a Liberty Mutual claims specialist, asked for additional information and copies of homeowner complaints, repair work and cost documentation, claim notices submitted to Weitz or subcontractors and Frank's reports. On June 13, Desert Mountain wrote to say it had concluded it needed to proceed with repair work over the summer months, when many residents would be away (so relocation costs would be avoided) and contractors would be available. Liberty Mutual responded by letter on June 26. It explained that it could not begin a "coverage review" until it received more information and the documents it had requested. In the meantime, the insurer warned Desert Mountain that it was not authorizing the repair work that Desert Mountain proposed. It added, "We offer no recommendations at this time, and can neither authorize you to commence the work, nor suggest that you not commence the work." By the end of June 2001, Desert Mountain had provided Liberty Mutual with some of the documents the insurer had requested, but had not furnished any homeowner complaints or documents relating to the repairs it already had performed.

¶ 6 Believing it had an obligation to repair the damages and desiring to maintain customer goodwill, Desert Mountain proceeded

---

1. We view the facts in the light most favorable to upholding the jury's verdict. *A Tumbling–T Ranches v. Flood Control Dist. of Maricopa County*, 222 Ariz. 515, 521 n. 1, 217 P.3d 1220, 1226 n. 1 (App.2009).

2. The acronym "CGL," which prior to 1986 stood for "comprehensive general liability," now means "commercial general liability." *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 910 N.E.2d 290, 293 n. 3 (2009) (citing 9A G. Couch on Insurance, § 129:1, at 129–5 (3d ed. 2005)). "[CGL] policies are designed to protect the insured against losses to third parties arising out of the operation of the insured's business." *Id.*(citing Couch § 129:2, at 129–7). From time to time in this Opinion we will refer to the form of the Liberty Mutual policies as a "CGL" policy form.

to make additional repairs during summer 2001 even though it had yet to receive a coverage response from Liberty Mutual. In October 2001, concerned that the statute of limitations was about to run on its claims against Weitz, Desert Mountain filed suit against the contractor, asserting it was responsible for the construction defects that had caused the damage necessitating the repairs. It was not until November 26, 2002, however, that Desert Mountain provided to Liberty Mutual the remainder of the documents the insurer had requested. After reviewing the information, Liberty Mutual in February 2003 denied Desert Mountain's claim for coverage, citing the policies' voluntary payment and known loss provisions.

¶ 7 Desert Mountain then sued Liberty Mutual, alleging breach of contract and breach of the duty of good faith. The superior court granted Liberty Mutual's motion for summary judgment on the bad faith claim. The court also held that, consistent with *United States Fidelity & Guaranty Corp. v. Advance Roofing & Supply Co.*, 163 Ariz. 476, 482, 788 P.2d 1227, 1233 (App.1989), Desert Mountain could not recover the cost of repairing the poorly compacted soil but could recover amounts it spent to repair property damage that resulted from the soil settlement. *See Lennar Corp. v. Auto-Owners Ins. Co.*, 214 Ariz. 255, 262, ¶ 17, 151 P.3d 538, 545 (App.2007) (distinguishing between "faulty workmanship standing alone," which is not covered because it is not an occurrence under the standard CGL policy, and "faulty workmanship that causes damage to property," which may implicate coverage.)

¶ 8 During a 12–day trial, Desert Mountain presented evidence of $7,311,087 in damages, including repair costs, consulting fees and attorney's fees incurred in the Weitz lawsuit. After crediting amounts received in settlements with other insurers, Weitz and other contractors, Desert Mountain asked the jury to award it $1,500,346 in damages. Liberty Mutual did not take issue at trial with the nature of the repairs Desert Mountain undertook, nor did it argue that the expenses Desert Mountain incurred were unreasonable; it argued only that its policies did not cover the expenses. The jury found in favor of Desert Mountain on its contract claim and awarded $500,000 in damages. The court granted Desert Mountain its attorney's fees and costs and denied Liberty Mutual's motion for judgment as a matter of law or new trial.

¶ 9 Liberty Mutual timely appealed, and Desert Mountain timely cross-appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).

## DISCUSSION

### I. Liberty Mutual's Appeal.

¶ 10 Liberty Mutual asserts the superior court erroneously instructed the jury and erred by denying its motion for judgment as a matter of law and for new trial.

### A. Standards of Review.

¶ 11 Whether a jury instruction correctly states the law is a matter of law that we review *de novo.* *A Tumbling–T Ranches v. Flood Control Dist. of Maricopa County*, 222 Ariz. 515, 533, ¶ 50, 217 P.3d 1220, 1238 (App.2009). We consider all of the instructions together to determine whether they misled the jury. *Levitt v. First Am. Title Ins. Co. of Ariz.*, 159 Ariz. 359, 364, 767 P.2d 707, 712 (App.1988). We will reverse only if an erroneous instruction prejudiced the appellant's rights. *Am. Pepper Supply Co. v. Fed. Ins. Co.*, 208 Ariz. 307, 309, ¶ 7, 93 P.3d 507, 509 (2004); *see also Thompson v. Better–Bilt Aluminum Prods. Co., Inc.*, 187 Ariz. 121, 126, 927 P.2d 781, 786 (App.1996).

¶ 12 Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Ariz. R. Civ. P. 50(a)(1); *see also Roberson v. Wal–Mart Stores, Inc.*, 202 Ariz. 286, 290, ¶ 14, 44 P.3d 164, 168 (App.2002) ("The 'motion should be granted if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense.' ") (quoting *Orme Sch. v. Reeves*, 166 Ariz. 301,

309, 802 P.2d 1000, 1008 (1990)). We review the superior court's denial of a motion for judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to the non-moving party. *Saucedo ex rel. Sinaloa v. Salvation Army*, 200 Ariz. 179, 181–82, ¶ 9, 24 P.3d 1274, 1276–77 (App.2001).

## B. The Insuring Clause: Repair Costs as "Damages" the Insured Is "Legally Obligated to Pay."

¶ 13 Liberty Mutual promised in each of the two policies to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." The policies did not define "legally obligated" or "damages." Liberty Mutual contends that because none of the homeowners sued Desert Mountain over the soil settlement problems, Desert Mountain was not "legally obligated" to make the repairs.[3] Liberty Mutual argues that it "agreed to pay monetary damages for [Desert Mountain's] legal obligations for causing property damage; it did not underwrite a warranty program for [Desert Mountain] to rectify its defective work."

¶ 14 We interpret an insurance policy according to its plain and ordinary meaning, examining it from the viewpoint of an individual untrained in law or business. *Messina v. Midway Chevrolet Co.*, 221 Ariz. 11, 14, ¶ 9, 209 P.3d 147, 150 (App.2008). If a policy appears ambiguous, we consider "legislative goals, social policy, and examination of the transaction as a whole." *Employers Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262, 264, ¶ 9, 183 P.3d 513, 515 (2008) (quoting *State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 257, 782 P.2d 727, 733 (1989)). A policy is ambiguous if it is subject to "conflicting reasonable interpretations." *Wilson*, 162 Ariz. at 258, 782 P.2d at 734.

¶ 15 Liberty Mutual cites California cases holding that an insurer's duty to indemnify an insured for sums the insured becomes "legally obligated to pay as damages" only extends to amounts a court has ordered the insured to pay. *See, e.g., County of San Diego v. Ace Prop. & Cas. Ins. Co.*, 37 Cal.4th 406, 33 Cal.Rptr.3d 583, 118 P.3d 607, 617 (2005) (" 'damages' has legally and traditionally always been understood as limited to money ordered by a court"); *Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94, 105 (2001) ("insurer's duty to indemnify the insured for 'all sums that the insured becomes legally obligated to pay as damages' is limited to money ordered by a court"). These cases rest in part on the premise that because " '[d]amages' exist traditionally inside of court," that term limits the phrase "sum[s] that the insured becomes legally obligated to pay." *Id.*, 103 Cal.Rptr.2d 672, 16 P.3d at 104.

¶ 16 As the California courts acknowledge, however, their interpretation of the policy language is the minority view. *Id.*, 103 Cal. Rptr.2d 672, 16 P.3d at 106. Courts in other jurisdictions have defined more broadly the term "legally obligated to pay as damages" in standard CGL policies. *See, e.g., Pub. Serv. Co. of Colo. v. Wallis & Cos.*, 955 P.2d 564, 567 (Colo.App.1997) (insured is "legally liable" for costs when statute imposed responsibility but no lawsuit was commenced; "[i]f the insurers had intended to provide coverage only when an enforcement action or lawsuit was brought, such a requirement could have been included in the policy language"), *rev'd on other grounds*, 986 P.2d 924 (Colo. 1999); *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 625 A.2d 1021, 1031–32 (1993) (even absent suit or formal administrative claim, insured was "legally obligated to pay" statutory environmental response costs it incurred in "cooperative" relationship with state regulatory agency); *Helena Chem. Co. v. Allianz Underwriters Ins. Co.*, 357 S.C. 631, 594 S.E.2d 455, 458 (2004); *Olds-Olympic, Inc. v. Commercial Union Ins. Co.*, 129 Wash.2d 464, 918 P.2d 923, 927–28 (1996)

---

3. The superior court ruled on this issue in instructing the jury and in denying Liberty Mutual's motion for judgment as a matter of law and for new trial. On appeal, Liberty Mutual argues the costs Desert Mountain incurred were not covered because the developer was not sued, no judgment was entered against it, and it entered into no settlement obligating it to make repairs. The insurer does not specifically argue that coverage would not exist for payments made in settlement of a civil suit.

("[I]t would be a 'reasonable reading' of a CGL policy to conclude there is coverage even prior to a suit or formal claim where a statute imposes liability and there has been property damage.") (internal citation omitted).

¶ 17 The language in the Liberty Mutual policies may be interpreted according to its plain and ordinary meaning, as one untrained in law or business would understand it. *See Messina,* 221 Ariz. at 14, ¶ 9, 209 P.3d at 150. Reading the policies in that manner, a "legal obligation to pay" means any obligation enforceable by law, including, for example, an obligation created by statute, contract or the common law. Once created, the obligation exists prior to and even in the absence of a suit to enforce it or a court order compelling performance. *See Megonnell v. United Servs. Auto. Ass'n,* 368 Md. 633, 796 A.2d 758, 765–66 (2002); *cf. Jaramillo v. Champagne Pools of Ariz., Inc.,* 125 Ariz. 398, 400, 609 P.2d 1098, 1100 (App.1980) ("doing or undertaking to do only that which one *is already under a legal obligation to do by his contract* is no consideration for another's agreement to do what he is not already under a legal obligation to do") (quoting 17 Am. Jur. 2d *Contracts* § 461 at 927–28 (1964)) (emphasis added).

¶ 18 In short, although a court may *enforce* a legal obligation, in the usual case, no court action is required to *create* a legal obligation. For that reason, we conclude the better-reasoned rule is that coverage for sums an insured becomes "legally obligated to pay as damages" may be triggered even in the absence of a civil lawsuit against the insured or a court order requiring the insured to make payment.

¶ 19 Liberty Mutual argues the cases adopting this rule, *supra* ¶ 16, are distinguishable because they arise in the context of environmental laws that impose strict liability upon responsible parties. *See, e.g., Bausch & Lomb,* 625 A.2d at 1025 n. 2 (discussing Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*). But the language of the policy does not imply, let alone require, that "legally obligated to pay" means "strictly liable to pay."

¶ 20 Implicit in Liberty Mutual's argument is the contention that indemnification should not be available to an insured that pays to settle a questionable claim before the claim is tested in the crucible of litigation. But the insuring clause imposes no indemnification obligation when an insured pays to settle a meritless claim; if a claim lacks merit, the insured by definition is under no "legal obligation to pay." The "voluntary payments" provision in the standard CGL policy acts as another constraint on an insured that for business reasons might consider entering into a pre-litigation settlement with a customer who raises a claim of questionable merit. *See infra* ¶¶ 43–47.

¶ 21 In any event, none of the concerns Liberty Mutual raises has any real application in this case. The insurer offers no argument that Desert Mountain would not have been liable to its customers for breach of implied warranty arising from the sale of the new homes. *See Woodward v. Chirco Constr. Co.,* 141 Ariz. 514, 516, 687 P.2d 1269, 1271 (1984) (six-year limitations period applies to claim for breach of "implied warranty of workmanlike performance" in a home construction contract); *cf. The Lofts at Fillmore Condominium Ass'n v. Reliance Comm. Const., Inc.,* 218 Ariz. 574, 576 n. 2, ¶ 11, 190 P.3d 733, 735 n. 2 (2008) (assuming without deciding that implied warranty of workmanship and habitability could be enforced against developer). Nor, as we have said, did Liberty Mutual contest the reasonableness of the repairs Desert Mountain performed.

¶ 22 In its reply brief, Liberty Mutual argues for the first time that because an insurer's duty to defend under a CGL policy is broader than its duty to indemnify, and because the duty to defend arises only when the insured is sued, the insurer has no duty to indemnify absent a lawsuit against the insured. *See, e.g., Certain Underwriters,* 103 Cal.Rptr.2d 672, 16 P.3d at 103–04; *cf. Manny v. Anderson's Estate,* 117 Ariz. 548, 550, 574 P.2d 36, 38 (App.1977) (discussing whether insurer could have breached its duty to defend wrongful death action prior to filing of complaint).

¶ 23 But the first principle underlying Liberty Mutual's argument means only that an insurer may have a duty to defend even when the existence of a covered claim is not certain. As we said in *Lennar Corp.*, "[T]he insurer would have the duty to defend a suit alleging facts that, if true, would give rise to coverage, even though there would ultimately be no obligation to indemnify if the facts giving rise to coverage were not established." *Id.* at 261, ¶ 11, 151 P.3d at 544.

¶ 24 As to whether a duty to defend may apply absent litigation, the standard CGL policy expressly refers to a lawsuit: "We will have the right and duty to defend the insured against any 'suit' seeking ... damages [covered by the policy]." [4] By contrast, the policy's insuring clause ("We will pay those sums that the insured becomes legally obligated to pay as damages") makes no comparable reference to a lawsuit, suit or other legal proceeding. Given the distinct difference in the policy's treatments of the two duties, even accepting for purposes of argument Liberty Mutual's assertion that an insurer is not obligated to defend the insured in the absence of a formal legal proceeding, we cannot accept its argument that the insurer's duty to indemnify is likewise limited. [5]

¶ 25 Similarly, the plain and ordinary meaning of "damages," as understood by an individual untrained in law or business, is not constrained in the manner Liberty Mutual argues. For example, "damages" is commonly defined as "the estimated money equivalent for detriment or injury sustained." Random House Webster's Unabridged Dictionary 504 (Deluxe 2d ed. 2001). This meaning is far broader than "sums that a court orders to be paid," Liberty Mutual's proposed definition.

¶ 26 This conclusion is supported by cases upholding coverage of expenses an insured incurs prior to or in the absence of litigation. In *Helena Chemical*, for example, the court rejected the assertion that environmental cleanup costs the insured paid at the request of a state authority were not "damages" within the meaning of the policy. 594 S.E.2d at 457. It concluded, "The plain, ordinary meaning of 'damages' is monies paid on an insured's loss, in this case, from property damages." *Id.* at 458; *see also SnyderGeneral Corp. v. Century Indemn. Co.*, 113 F.3d 536, 539 (5th Cir.1997) (under Texas law, environmental cleanup costs incurred voluntarily are "damages"); *Chesapeake Utils. Corp. v. Am. Home Assurance Co.*, 704 F.Supp. 551, 558–59 (D.Del.1989) (Maryland law; cleanup costs incurred after state environmental authority placed insured's facility on hazardous waste list fell within policy language obligating insurer to pay "all sums which the insured shall become obligated to pay by reason of liability *for damages* ") (emphasis in original); *Aetna Cas. & Sur. Co. v. Commonwealth of Kentucky*, 179 S.W.3d 830, 838–39 (Ky.2005) (government-mandated environmental cleanup costs fall within sums paid as damages within the meaning of liability policy); *Bausch & Lomb*, 625 A.2d at 1032–33 (environmental "response costs" incurred prior to suit or administrative claim are "damages" within policy language; "ordinary person understands 'damages' as meaning money paid to make good an insured loss"); *Olds–Olympic*, 918 P.2d at 927–30 (environmental cleanup costs incurred at request of state authorities were "damages" that the insured was "legally obligated to pay within the meaning of" the CGL policy).

¶ 27 The expenses Desert Mountain incurred in making the repairs and for which it sought coverage under the Liberty Mutual policies constituted the "estimated money equivalent for detriment or injury sustained" by the homeowners. As noted, Liberty Mutual agreed at trial that the repairs and costs were necessary and reasonable; those concessions support the conclusion that the expenses were a sufficient equivalent for the detriment the homeowners sustained. Ac-

---

**4.** The Liberty Mutual policies defined "suit" to mean an arbitration, alternative dispute resolution or "civil proceeding" in which damages are alleged.

**5.** We note some authorities have held an insurer's duty to defend may arise in the absence of a suit. *See Ryan v. Royal Ins. Co. of Am.*, 916 F.2d 731, 738 (1st Cir.1990) (citing cases; prior to the filing of a lawsuit, duty to defend hinges on "coerciveness or adversariness" of communications from claimant).

cordingly, the superior court did not err in holding the expenses Desert Mountain incurred in repairing property damage resulting from the faulty soil compaction could be "damages" that Desert Mountain was "legally obligated to pay" under the policies.

## C. Coverage of Damages Arising Out of Breach of Contract.

¶ 28 In *Flagstaff Affordable Housing Limited Partnership v. Design Alliance, Inc.*, 223 Ariz. 320, 321, ¶ 1, 223 P.3d 664, 665 (2010), our supreme court held the economic loss doctrine bars a building owner from recovering tort damages arising from faulty work by an architect that causes "economic loss but no physical injury to persons or other property." In such a circumstance, the court held, the building owner is limited to its contract remedies. *Id.*

¶ 29 The damage resulting from the construction defects in this case constituted economic loss because the only property damaged was the property that was "itself the subject" of the contracts between Desert Mountain and the customers who purchased the homes. *See id.* at 323, ¶ 11, 223 P.3d at 667. Accordingly, Desert Mountain could be liable to the homeowners only in contract, and not in tort. *See id.* at 326–27, ¶¶ 28, 33, 223 P.3d at 670–71 (unless the contract otherwise provides, a party to a contract "is limited to its contractual remedies for purely economic loss from construction defects"). Liberty Mutual contends that as a general proposition, liability insurance covers damages arising from accidents that result in tort claims, not damages arising from breaches of contract. From that it argues that because Desert Mountain could be liable to the homeowners only in contract, its claim for cover-

age did not fall within the insuring clause of the policies.

¶ 30 Liberty Mutual relies in large part on *Stanford Ranch, Inc. v. Maryland Casualty Co.*, 89 F.3d 618 (9th Cir.1996), for the proposition that the insuring clause of a CGL policy is not triggered by a claim arising out of contract. But the court in that case applied California law, and in a decision issued after *Stanford Ranch*, the California Supreme Court rejected the proposition that a CGL policy never may cover a contractual liability. *Vandenberg v. Superior Court*, 21 Cal.4th 815, 88 Cal.Rptr.2d 366, 982 P.2d 229, 234 (1999). The court in *Vandenberg* addressed a policy that, like the Liberty Mutual policies at issue here, covered sums the insured "was legally obligated to pay as damages because of property damage." *Id.*, 88 Cal.Rptr.2d 366, 982 P.2d at 243. The court held an insurer "cannot avoid coverage for damages awarded against" an insured "solely on grounds the damages were assessed on a contractual theory." *Id.*, 88 Cal.Rptr.2d 366, 982 P.2d at 246. Instead, the phrase "legally obligated to pay" refers "to any obligation which is binding and enforceable under the law, whether pursuant to contract or tort liability." *Id.*, 88 Cal.Rptr.2d 366, 982 P.2d at 245.

¶ 31 To be sure, other jurisdictions have held an insurer's agreement to cover amounts the insured is "legally obligated to pay as damages" applies only to liability arising out of tort and not to contract damages. *See, e.g., Aetna Cas. & Sur. Co. v. Spancrete of Ill., Inc.*, 726 F.Supp. 204, 206 (N.D.Ill. 1989) (applying Illinois law); *Action Ads, Inc. v. Great Am. Ins. Co.*, 685 P.2d 42, 44 (Wyo.1984).[6] Although some of these cases address the issue in considering whether the damages for which coverage is sought arise

---

6. Liberty Mutual argues this court previously decided this issue in *Kema Steel, Inc. v. The Home Insurance Co.*, 153 Ariz. 315, 736 P.2d 798 (App. 1986). At issue in *Kema* was whether a policy covered an employer's liability for negligence and breach of contract arising out of its failure to procure medical insurance for an employee. *Id.* at 316, 736 P.2d at 799. The liability policy covered damages "caused by an occurrence," defined to "mean[] an accident ... which results in bodily injury or property damage neither expected nor intended from the standpoint of the

Insured." *Id.* This court held the policy did not cover the liability because the employee's lawsuit was not an "accident" within the meaning of the policy. *Id.* On a motion for reconsideration, the court briefly and without analysis added that the employer's failure to provide coverage "was not an accident within the meaning of the policy .... It was a breach of contract." *Id.* at 317, 736 P.2d at 800. We do not understand the *Kema* court to have held that as a general proposition, a CGL policy never may apply to liability arising out of contract.

out of an "occurrence," they generally embrace the notion that a CGL policy does not extend to liability arising out of contract:

> To allow indemnification under [a breach of contract theory] would have the effect of making the insurer a sort of silent business partner subject to great risk in the economic venture without any prospects of sharing in the economic benefit. The expansion of the scope of the insurer's liability would be enormous without corresponding compensation. There is simply no reason to expect that such a liability would be covered under a comprehensive liability policy which has, as its genesis, the purpose of protecting an individual or entity from liability for essentially accidental injury . . . .

*Keystone Filler & Mfg. Co. v. Am. Mining Ins. Co.,* 179 F.Supp.2d 432, 439 (M.D.Pa. 2002) (quoting *Phico Ins. Co. v. Presbyterian Med. Servs. Corp.,* 444 Pa.Super. 221, 663 A.2d 753, 757–58 (1995)).[7]

¶ 32 We decline to hold that as a matter of law, a CGL policy does not cover liability arising out of contract. While there is some appeal to the notion that a breach of contract is not the sort of accidental risk to which liability insurance is designed to apply, we are reluctant to read such a limitation into a CGL policy when the parties have not chosen to write it for themselves. The policies at issue here included various express limitations or exclusions that may apply to certain contractual liabilities. *See infra* ¶¶ 34–42. The fact that those express provisions do not flatly bar coverage of all contract claims supports our decision to decline to imply into the policies the broad principle that coverage is not afforded to damages arising from contract. *See, e.g., Am. Family Mut. Ins. Co. v. Am. Girl, Inc.,* 268 Wis.2d 16, 673 N.W.2d 65, 76, ¶ 39 (2004) (although "CGL policies generally do not cover contract claims arising out of the insured's defective work or product, . . . this is by opera-

tion of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an 'occurrence' within the meaning of the CGL's initial grant of coverage").[8]

¶ 33 Instead, we hold that the "proper inquiry is whether an 'occurrence' has caused 'property damage,' not whether the ultimate remedy for that claim lies in contract or in tort." *Lamar Homes, Inc. v. Mid–Continent Cas. Co.,* 242 S.W.3d 1, 16 (Tex.2007). As the Texas Supreme Court stated in *Lamar,* "Any preconceived notion that a CGL policy is only for tort liability must yield to the policy's actual language." *Id.* at 13; *accord Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.,* 33 Kan.App.2d 504, 104 P.3d 997, 1003 (2005).

¶ 34 Of course, our conclusion that standard CGL policies contain no implied absolute bar of coverage of contractual liabilities does not preclude application of express exclusions of such liability. In supplemental briefing we requested after our supreme court issued its decision in *Flagstaff Affordable Housing,* Liberty Mutual argues an express "contractual liability exclusion" in its policies barred coverage of Desert Mountain's claims in this case.

¶ 35 At issue is an endorsement by which the policies excluded

> "[P]roperty damages" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages

> (1) That the insured would have in the absence of the contract or agreement; or

> (2) Assumed in a contract or agreement that is an "insured contract" provided the . . . "property damage" occurs sub-

---

7. Under Arizona law, damage resulting from faulty workmanship can constitute an "occurrence." *Lennar Corp.,* 214 Ariz. at 262, ¶ 19, 151 P.3d at 545.

8. The Wisconsin court added, "If . . . losses actionable in contract are never CGL 'occurrences' for purposes of the initial coverage grant, then

the business risk exclusions are entirely unnecessary . . . . Why would the insurance industry exclude damage to the insured's own work or product if the damage could never be considered to have arisen from a covered 'occurrence' in the first place?" 673 N.W.2d at 78, ¶ 47.

sequent to the execution of the contract or agreement.[9]

The question under this policy exclusion is whether Desert Mountain's obligations to its customers gave rise to "damages by reason of the assumption of liability in a contract or agreement" within the meaning of the exclusion. Put differently, did the sales contracts Desert Mountain entered into with its customers constitute "assumption of liability in a contract or agreement" within the meaning of the policy? [10]

¶ 36 Liberty Mutual has not directed our attention to any case from any jurisdiction that construes the "assumption of liability in a contract" exclusion to encompass any contract, regardless of its nature. To the contrary, the cases appear in agreement that this exclusion applies only to "the assumption of another's liability, such as an agreement to indemnify or hold another harmless." *Smithway Motor Xpress, Inc. v. Liberty Mut. Ins. Co.*, 484 N.W.2d 192, 196 (Iowa 1992); *see also Provident Bank of Md. v. Travelers Prop. Cas. Corp.*, 236 F.3d 138, 146–47 (4th Cir.2000) (Maryland law); *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 693 (Tex.App.2006); *Am. Girl*, 673 N.W.2d at 81, ¶ 58; *Gibbs M. Smith, Inc. v. U.S. Fid. & Guar. Co.*, 949 P.2d 337, 341 (Utah 1997); *Marlin v. Wetzel County Bd. of Educ.*, 212 W.Va. 215, 569 S.E.2d 462, 469 (2002). Accordingly, we conclude that the contractual liability exclusion in the policies did not apply to damages arising out of Desert Mountain's contractual liability to its customers.

### D. Broad Form Property Damage Exclusion.

██ ¶ 37 In its supplemental brief, Liberty Mutual also argues Desert Mountain's claims were excluded by the "Broad Form Property Damage" endorsement to the policies. This endorsement provided:

Coverage is not provided for the insured's liability for damage:

\*　　\*　　\*

D. To that particular part of any property, not on premises owned by or rented to the insured,

\*　　\*　　\*

3. the restoration, repair, or, replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured.

With respect to the completed operations hazard, to property damage to work performed by the named insured arising out of the work or any portion thereof, or out of materials part of equipment furnished in connection therewith....

¶ 38 The final (un-numbered) paragraph of this exclusion does not apply to damages caused by the defective soil compaction because the homes were built by Weitz, not Desert Mountain. Because Desert Mountain did not build the homes (or compact the soil in preparation for the homes), the defective work was not "work performed by the named insured" within the meaning of that provision. *See Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.*, 864 F.2d 648, 651–52 (9th Cir.1988) (applying Oregon law and citing circular prepared by the Insurance Services Office, which published the standard form endorsement, and other industry publications for the proposition that the exclusion applies to work performed by the insured but not by

---

9. Neither of the exceptions to this exclusion applies in this case. As we have noted, Desert Mountain's liability for the damages at issue arises only out of contract, not in tort. *See Flagstaff Affordable Housing*, 223 Ariz. at 326–27, ¶¶ 28, 33, 223 P.3d at 670–71; *supra* ¶ 29. And Desert Mountain does not argue that the liability fell within the "insured contract" provision.

10. Although the language of the two policies determines the outcome of most of the issues in this appeal, neither party directed this court to the specific location of any of the relevant policy provisions. Each of the two policies is 84 pages long, but in their briefs, both parties cited to policy provisions only by referring generally to "Trial Exhibit 2" or "Trial Exhibit 3," in violation of Arizona Rule of Civil Appellate Procedure 13(a)(6), (b)(1) (briefs shall include "citations to the authorities, statutes and parts of the record relied on"). Breach of this rule may result in sanctions, including waiver. *Ritchie v. Krasner*, 221 Ariz. 288, 305, ¶ 62, 211 P.3d 1272, 1289 (App.2009); *see A Tumbling–T Ranches*, 222 Ariz. at 529, ¶ 34, 217 P.3d at 1234 (it is not the responsibility of this court to search the record for authorities that support parties' arguments).

insured's agent); *Fejes v. Alaska Ins. Co.,* 984 P.2d 519, 525 (Alaska 1999); *Md. Cas. Co. v. Reeder,* 221 Cal.App.3d 961, 270 Cal. Rptr. 719, 724–26 (1990); *Harbor Ins. Co. v. Tishman Constr. Co.,* 218 Ill.App.3d 936, 161 Ill.Dec. 551, 578 N.E.2d 1197, 1201–02 (1991).

¶ 39 Liberty Mutual argues, however, that Desert Mountain's claim was excluded under the language contained in subpart D(3) of the Broad Form Property Damage endorsement.

¶ 40 As noted, *supra* ¶ 7, the superior court held Desert Mountain could not recover expenses incurred in repairing the soil settlement itself, but instead could recover only the expenses of repairing damage that resulted from the soil settlement. *See Lennar Corp.,* 214 Ariz. at 262, ¶ 17, 151 P.3d at 545; *Advance Roofing,* 163 Ariz. at 482, 788 P.2d at 1233.[11] On appeal, Liberty Mutual contends that the expenses Desert Mountain incurred in repairing damage caused by the faulty soil compaction were excluded by subpart D(3) because they constituted damage "[t]o that particular part of any property . . . the . . . repair . . . of which has been made . . . necessary by reason of faulty workmanship thereon by or on behalf of the insured."

¶ 41 In support of its contention, Liberty Mutual cites *Knutson Construction Co. v. St. Paul Fire and Marine Insurance Co.,* 396 N.W.2d 229, 235 (Minn.1986), which held this endorsement generally excludes coverage of "claims of defective materials and workmanship giving rise to a claim for damage to the property itself which is the subject matter of the construction project." Other authorities, however, interpret the endorsement to exclude only damage to the defective component of the product but not damage *resulting from* the defective component. *See, e.g., E & R Rubalcava Constr., Inc. v. Burlington Ins. Co.,* 148 F.Supp.2d 746, 749 (N.D.Tex.2001); *Underwriters at Interest v. SCI Steelcon,* 905 F.Supp. 441, 444 (W.D.Mich.1995); *Fejes,* 984 P.2d at 524; *see generally Fortney & Weygandt, Inc. v. Am. Manuf. Mut. Ins. Co.,* 595

F.3d 308 (6th Cir.2010), and *Mid–Continent Cas. Co. v. JHP Dev., Inc.,* 557 F.3d 207, 215 (5th Cir.2009) (interpreting similar exclusions).

¶ 42 Consistent with these cases, we hold the Broad Form Property Damages exclusion does not bar coverage of damage to non-defective property resulting from faulty workmanship. By its terms, the exclusion applies only to the repair of "that particular part of any property . . . made . . . necessary by reason of faulty workmanship thereon." Given the narrow scope of the exclusion, we conclude it applies only to the repair of defective workmanship and not to the repair of damage that resulted from the defective workmanship. Because the endorsement excludes only damage to property "by reason of faulty workmanship thereon," the exclusion did not bar coverage of damage to non-defective property resulting from the faulty soil compaction in this case.

## E. The "Voluntary Payments" Clause.

¶ 43 Liberty Mutual next argues the repair costs were not covered because Desert Mountain undertook the repairs voluntarily, without Liberty Mutual's consent. It relies for this argument on a provision in the policies that stated, "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."

¶ 44 In *Arizona Property & Casualty Insurance Guaranty Fund v. Helme,* 153 Ariz. 129, 136, 735 P.2d 451, 458 (1987), the supreme court observed that the purpose of this provision in the standard liability policy is "to protect the insurer's right to a fair adjudication of the insured's liability and to prevent collusion between the insured and the injured person." The court held an insured's breach of the clause ordinarily would "relieve[ ] a *prejudiced* insurer of liability under the policy." *Id.* at 136–37, 735 P.2d at 458–59 (emphasis added).[12]

---

11. In *Advance Roofing,* we did not address a business risk exclusion but instead considered whether faulty workmanship, by itself, could constitute an "occurrence" within the meaning of the standard CGL policy. Citing the "fundamental nature of a comprehensive general liability

policy," we held that "mere faulty workmanship, standing alone, cannot constitute an occurrence" within the meaning of such a policy. 163 Ariz. at 482, 788 P.2d at 1233.

12. The clause at issue in *Helme* stated that the insured "shall not, except at his own cost, volun-

¶ 45 Liberty Mutual does not take issue with the superior court's decision, consistent with *Helme,* to instruct the jury that it could prevail on this defense only if it proved Desert Mountain's "actions had an actual and substantial adverse [effect] on Liberty Mutual's rights to defend, settle or adjust the claim." On appeal, Liberty Mutual contends Desert Mountain made the repairs without asserting defenses it could have raised had the homeowners sued over the defects and did not obtain releases from the homeowners after repairs were completed. Without addressing whether Desert Mountain breached the voluntary payments clause, we hold there was sufficient evidence from which the jury could conclude that Liberty Mutual was not prejudiced by Desert Mountain's actions.

¶ 46 Liberty Mutual argues that if the homeowners had sued Desert Mountain for damages, their claims would have been barred by limitations because the express warranties Desert Mountain issued to its customers expired in or about 1999. But Liberty Mutual's argument fails to address the six-year limitations period that applies to claims for breach of the implied warranty of workmanship and habitability in a new home. *See Woodward,* 141 Ariz. at 516, 687 P.2d at 1271. Moreover, although Liberty Mutual argues it was prejudiced because Desert Mountain did not require homeowners to sign releases of future claims in exchange for the repairs, on appeal it does not cite any subsequent demand for repair that would have been barred by such a release. Finally, as noted, Liberty Mutual conceded that the repairs Desert Mountain performed were necessary and reasonable, and Strickland, the Liberty Mutual claims specialist, testified an insured in Desert Mountain's position has a duty to mitigate its damages.

¶ 47 Accordingly, because there was evidence from which the jury could have found that Liberty Mutual suffered no prejudice from Desert Mountain's decision to undertake the repairs, we conclude the superior court properly denied Liberty Mutual's mo-

tion for judgment as a matter of law under the voluntary payments clause. *See Roberson,* 202 Ariz. at 290, ¶ 14, 44 P.3d at 168 (judgment as a matter of law appropriate only "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense").

## F. The "Known Loss" Provision.

¶ 48 Liberty Mutual next argues Desert Mountain's claims were barred by the policies' "known loss" provision because the developer knew of significant settlement-related problems before it purchased the policies.

¶ 49 The policies stated:

This insurance applies ... only if: ... [p]rior to the policy period, no insured ... and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the ... "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the ... "property damage" occurred, then any continuation, change or resumption of such ... "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

¶ 50 Liberty Mutual argues it offered evidence that Desert Mountain knew of soil-related problems from homeowner complaints and geotechnical reports received prior to the effective dates of the policies. It argues this knowledge triggered the known loss clause even if at the time the company did not know of the widespread nature of the problem. It bases this argument on the portion of the known loss provision applying to knowledge of property damage, "in whole or in part," that "continu[es], change[s], or resum[es]" during or after the policy period. (Emphasis added).

¶ 51 Our review of the record persuades us that sufficient evidence existed

tarily make any payment, assume any obligation, or incur any expense." 153 Ariz. at 136, 735

P.2d at 458.

from which jurors could find that Desert Mountain lacked knowledge of the relevant property damage before the policies began. William Schoettker, Desert Mountain's vice president of development at the time, testified concerning homeowner complaints received prior to the initial policy period:

> At that time, we didn't know this. We knew we had an issue. It was sent to the general contractor. It was sent to engineers. They reviewed it. They made recommendations. Those recommendations were executed. The customer service issue was then handled, the owners signed off on the issue. *There was no reason to think we had a widespread settlement issue.* ... It all was resolved, and it was a thing of the past. No one even considered it any further once there was a resolution.

(Emphasis added). Liberty Mutual argues that two Desert Mountain employees who handled customer complaints learned of the settlement issues from homeowners prior to the first policy period. Those employees testified, however, that none of the complaints led them to believe there was a wide-scale problem with improper soil compaction. Both employees also told the jury that the problems they observed before the first policy commenced were minor issues typically seen in new home construction.

¶ 52 Liberty Mutual's own construction expert also agreed at trial that, based on his review of relevant records, after Desert Mountain resolved those initial homeowner complaints, "it was not until Mr. Frank came onboard and start[ed] doing his analysis that Desert Mountain had indication of further, and even ultimately wide scale compaction problems." Additionally, he agreed that Desert Mountain, "at least as far as everybody knew at the time, could reasonably conclude" that the settlement problems that caused homeowners to complain prior to the policy periods had been fully resolved.

¶ 53 Because there was sufficient evidence to support the jury's conclusion that Desert Mountain did not have knowledge of property damage caused by faulty soil compaction prior to the Liberty Mutual policies, the superior court did not err in denying Liberty Mutual's judgment as a matter of law on the issue of known loss. *See Roberson*, 202 Ariz. at 290, ¶ 14, 44 P.3d at 168.

### G. Coverage of Damage that "Continued, Changed or Resumed."

¶ 54 The policies provided that property damage that "occurs during the policy period" and was not "known" prior to the policy period "includes any continuation, change or resumption of that ... 'property damage' after the end of the policy period."

¶ 55 The superior court instructed the jury that "[t]he Liberty Mutual policies provide insurance coverage for property damage that continued, changed or resumed beyond the end of the policy period, if that damage occurred during the policy periods." Liberty Mutual argues that given the policies' known loss provision, the court's instruction was misleading and confusing because it was contrary to the policy language precluding coverage for known losses that continue or change over time. We disagree.

¶ 56 The instruction mirrored the policy language. The record indicates that, because the parties disagreed about the meaning of the known loss provision, the superior court chose to allow both sides to argue their positions to the jury rather than instruct the jury on the meaning of the provision. Liberty Mutual's counsel argued to the jury that the property damage was excluded as a known loss under the policies, and the policies were admitted in evidence.

¶ 57 Under these circumstances, the instruction was neither misleading nor confusing. Nor on this record can we conclude Liberty Mutual suffered any prejudice based on the instruction. *See Am. Pepper Supply Co.*, 208 Ariz. at 309, ¶ 7, 93 P.3d at 509 (reversal appropriate only when instruction is erroneous and appellant suffered prejudice).

### H. Expenses Incurred in Suing the Contractor.

¶ 58 Liberty Mutual next argues the superior court erred by allowing the jury to award Desert Mountain the attorney's fees it incurred in its lawsuit against Weitz.

¶ 59 In the ordinary case, when an insured is sued on a covered claim, the insurer must defend the insured, i.e., hire attorneys to represent the insured in the lawsuit brought by the claimant. When a third party is at fault, the insurer may seek recovery from the third party based on principles of subrogation by filing a complaint in which the insurer stands in the shoes of its insured.

¶ 60 This case turned that usual set of circumstances on its head: As we have seen, Desert Mountain agreed to repair its customers' homes even though none of the homeowners had brought suit. Desert Mountain then commenced its own lawsuit against Weitz, alleging the contractor was responsible for the soil-settlement problems that had damaged the homes. The superior court ruled in this case that Desert Mountain could recover the expenses of that lawsuit "upon proof of the necessity of the litigation with Weitz and the reasonableness of the litigation costs."

¶ 61 Generally speaking, when one party's breach of contract places the other in a situation that "makes it necessary to incur expense to protect his interest, such costs and expenses, including attorneys' fees, should be treated as the legal consequences of the original wrongful act and may be recovered as damages." *Fairway Builders, Inc. v. Malouf Towers Rental Co.*, 124 Ariz. 242, 258, 603 P.2d 513, 529 (App.1979) (quoting *U.S. Fid. & Guar. Co. v. Frohmiller*, 71 Ariz. 377, 380, 227 P.2d 1007, 1009 (1951)). The expenses, however, are recoverable only if they are a foreseeable result of the breach. *Id.*

¶ 62 Desert Mountain's then-controller, Richard Yehling, testified that two days after tendering notice of its claim to Liberty Mutual, Desert Mountain sent a demand letter to Weitz threatening litigation if the contractor would not agree to pay for the repair work. On cross-examination, Yehling testified that Desert Mountain's decision to sue Weitz "had nothing to do with the status of its claim with Liberty Mutual." On appeal, Liberty Mutual argues that because Desert Mountain would have sued Weitz regardless of whether Liberty Mutual accepted coverage, as a matter of law, Desert Mountain could not prove the Weitz lawsuit was a necessary consequence of Liberty Mutual's refusal to accept coverage.

¶ 63 Contrary to Liberty Mutual's contention, the record contains sufficient evidence from which the jury could find Liberty Mutual's breach of contract made it necessary for Desert Mountain to sue Weitz. *See Roberson*, 202 Ariz. at 290, ¶ 14, 44 P.3d at 168. As described above, *supra* ¶¶ 4–5, Desert Mountain gave notice of its claim in May 2001, telling Liberty Mutual it faced considerable exposure and needed to mitigate its damages by performing immediate repairs. Liberty Mutual responded in late June that it could not accept coverage of the claim without more information and cautioned that it could not authorize Desert Mountain to make any repairs in the meantime.

¶ 64 Yehling testified that, in the absence of a coverage decision from Liberty Mutual, Desert Mountain filed suit against Weitz in October 2001 because it believed the statute of limitations on its claims against the contractor was about to expire. He added that after filing suit, Desert Mountain purposefully did not pursue the litigation aggressively while it waited to hear whether Liberty Mutual and the company's other insurers would agree to provide coverage. Additionally, Strickland, Liberty Mutual's claims specialist, testified that given the insurer's failure to initiate litigation against Weitz, it was reasonable under the circumstances for Desert Mountain to protect its interests by doing so.

¶ 65 "The insured exposed by his insurer to the sharp thrust of personal liability need not indulge in financial masochism." *Helme*, 153 Ariz. at 137, 735 P.2d at 459 (internal quotation omitted). Desert Mountain found itself in an untenable situation in early fall 2001. It had sold scores of homes with latent defects that had caused substantial damages, and it was concerned that the damage to the homes would worsen if repairs were delayed. It had tendered a claim to Liberty Mutual, but the insurer had not accepted coverage. Meanwhile, Desert Mountain believed that poor workmanship by Weitz, its contractor, had caused the dam-

ages. If Liberty Mutual accepted the claim, it would be able to sue to recover from Weitz, but in the meantime, Desert Mountain believed the damage claim against Weitz would be barred by limitations if suit were not commenced promptly.[13] Given the uncertainty about whether Liberty Mutual would cover the claim, Desert Mountain might have found itself solely liable for the repair costs had it not filed suit against Weitz when it did. This evidence was sufficient to allow the jury to find that Liberty Mutual's failure to accept coverage made it necessary for Desert Mountain to file suit against Weitz.

¶ 66 Liberty Mutual contends, however, that because the projected repair costs ranged from $3 million to $10 million and its two policies together offered at most only $4 million in aggregate coverage, Desert Mountain would have ended up suing Weitz regardless of Liberty Mutual's coverage decision. But this argument ignores the fact that because Liberty Mutual failed to accept coverage, Desert Mountain had to file a complaint against Weitz to recover *any* reimbursement for the costs of repair. Furthermore, as described above, if Liberty Mutual had accepted the claim, it would have brought a subrogation claim against Weitz, and it, rather than Desert Mountain, would have incurred the attorney's fees and costs to prosecute that suit.

### I. Coverage of Preventive Measures.

¶ 67 Liberty Mutual argues the court erred in instructing the jury concerning coverage of preventive measures and by failing to grant its motion for judgment as a matter of law and for new trial because the jury awarded damages for repairs that constituted preventive measures.

#### 1. Jury instruction.

■ ¶ 68 The jury instruction at issue stated, "The Liberty Mutual policies provide insurance coverage for the costs incurred to prevent possible future damage to non-defective property, if that damage probably would

have occurred during the policy period if the preventative measures had not been performed." Liberty Mutual argues this instruction has no basis in the policies and, as a result, it is entitled to a new trial because it cannot be determined from the general verdict whether the jury would have reached the same result without the allegedly erroneous instruction.

¶ 69 In support of its position, Liberty Mutual cites several cases it contends hold that "damages" covered by a CGL policy may not include expenses incurred to prevent property damage. The cases it cites, however, are distinguishable because they involve situations in which the insured had not suffered any property damage before it took preventive measures or did not repair any damaged property, but paid *only* for preventive measures. *See, e.g., Fireman's Fund Ins. Co. v. Hartford Fire Ins. Co.*, 73 F.3d 811, 815 (8th Cir.1996) (cost of repairs to fire sprinkler supports not covered as "property damage" when repairs were undertaken to prevent flooding, but no flooding had occurred prior to the repairs); *N.H. Ins. Co. v. Vieira*, 930 F.2d 696, 701 (9th Cir.1991) (when diminution in value of housing project did not constitute "property damage" under policy, cost of installing a fire detection system was preventive measure not covered by the policy); *Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 502 (Del.2001) (costs incurred in government-ordered incineration of waste barrels not covered under policy when barrels had not yet caused harm but only "posed a threat to public health and welfare and the environment"); *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wash.2d 869, 784 P.2d 507, 516 (1990) ("costs owing because of property damages are remedial measures taken after pollution has occurred, but preventive measures taken *before* pollution has occurred are not costs incurred because of property damage") (emphasis added).

¶ 70 Here, by contrast to the cases Liberty Mutual cites, Desert Mountain proved it had suffered property damage covered by the

---

**13.** Strickland testified that had Liberty Mutual agreed to reimburse Desert Mountain for the repairs while reserving its right to contest coverage, the insurer could have directed the litigation against Weitz as a subrogation claim. In that event, of course, Liberty Mutual would have directly incurred the attorney's fees and costs of that lawsuit.

policy separate and apart from the expenses relating to the measures the insurer argues were preventive. Moreover, contrary to Liberty Mutual's argument, the instruction it challenges did not permit the jury to compensate Desert Mountain for any and all preventive measures; it limited recovery for such expenses to measures designed to prevent damages that "probably would have occurred during the policy period."

¶ 71 We agree with Desert Mountain that *Leebov v. United States Fidelity & Guaranty Co.*, 401 Pa. 477, 165 A.2d 82 (1960), supports the instruction the court gave in this case. The insured in *Leebov* was a contractor that was excavating a hillside when a break occurred in the bank, causing a landslide. *Id.* at 83. The policy covered "sums which the Insured shall become obligated to pay ... for damages because of ... destruction of property." *Id.* The Pennsylvania court rejected the insurer's contention that the policy did not cover expenses the contractor incurred to prevent the landslide from continuing:

> If the plaintiff had not taken immediate and substantial measures to remedy the perilous situation, disastrous consequences might have befallen the adjoining and nearby properties. If that had happened, the defendant would have been required to pay considerably more than is involved in the present lawsuit. It would be a strange kind of argument and an equivocal type of justice which would hold that the defendant would be compelled to pay out, let us say, the sum of $100,000 if the plaintiff had not prevented what would have been inevitable, and yet not be called upon to pay the smaller sum which the plaintiff actually expended to avoid a foreseeable disaster.

*Id.* at 84. Other cases are in agreement. *See AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 839, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990) (expense of limiting spread of environmental contamination may be covered "damages"); *cf. Am. Economy Ins. Co. v. Commons*, 26 Or.App. 153, 552 P.2d 612, 613 (1976) (fire suppression costs recoverable under CGL policy).

¶ 72 We adopt the reasoning of the *Leebov* court under these circumstances and hold the instruction given in this case was correct. *See A Tumbling-T Ranches*, 222 Ariz. at 533, ¶ 50, 217 P.3d at 1238.

**2. Evidence to support the verdict.**

¶ 73 Separate from its attack on the jury instruction, Liberty Mutual argues Desert Mountain presented insufficient evidence that certain work it performed constituted repair of existing damage resulting from the soil settlement rather than prevention of future damage from soil settlement.

¶ 74 According to the record, Desert Mountain divided the work it did to stabilize the affected homes into three categories: "A grout," "B grout" and "C grout." "A grout" was the category of work performed to stabilize faulty soil compaction. "B grout" included the installation of soil nails, helical piers, steel rebar, ties and grout employed to repair and stabilize damaged retaining walls, stem walls and footings that had rotated, settled or moved due to faulty soil compaction. Finally, "C grout" work was performed to lock into place retaining walls, stem walls and footings that had been repaired with B grout.

¶ 75 As noted, the superior court ruled prior to trial, pursuant to *Advance Roofing*, 163 Ariz. at 482, 788 P.2d at 1233, that Desert Mountain could not recover the costs of repairing defective workmanship—i.e., the poorly compacted soil—but could recover the costs of repairing property damaged by the defective work. Under that rule, Desert Mountain could not recover the expense of installing "A grout" because "A grout" was used to repair faulty soil compaction. On appeal, Liberty Mutual argues the court erred by permitting the jury to award damages for "B" and "C" grout because that work also was directed at preventing future damage, not repairing existing damage.

¶ 76 In support of its position, Liberty Mutual points to testimony by Frank that the purpose of "B" grouting was to prevent further movement of walls and footings, not to repair any existing property damage. Frank also testified that "C" grouting "[w]as intended to prevent future damage." As Desert Mountain points out, however, Frank further testified that some of the "B" and "C" grout

work lifted the affected structural components back into their correct positions, thereby repairing the components rather than (or in addition to) stabilizing them so they would incur no additional damage. And Liberty Mutual's expert witness agreed at trial that when "B" and "C" work lifted structures that had settled, that work could be classed as repair of resulting damage rather than a preventive measure. Liberty Mutual also acknowledges that in spite of his testimony related above, Frank also testified that the purpose of "B" and "C" grouting was to "stabilize poorly compacted fill property damage."

¶ 77 The peculiar nature of the repairs Desert Mountain performed makes it difficult to apply the strict rule that Liberty Mutual asserts should bar coverage of any measures that might have prevented additional damage resulting from the inadequately compacted soil. In many instances, rather than, for example, replace a wall that was sinking or listing due to settlement, Desert Mountain simply secured the wall in place, preventing further movement. Thus, Desert Mountain did not aim to return the wall to its original position (prior to the soil settlement); instead, its goal was to ensure that the wall would not move farther out of place. Under these circumstances, we are reluctant to hold that the jury erred by concluding that these measures constituted repairs of existing property damage rather than measures designed to prevent damage that might occur after the policies terminated.

¶ 78 Moreover, Liberty Mutual does not specify any amount the jury awarded for performing "preventive" repairs it contends were not covered by the policies. The jury issued a lump-sum verdict and was not asked to specify the amount of damages it awarded for any particular component of the expenses Desert Mountain sought. Because the jury awarded Desert Mountain only about a third of the total amount of damages it sought, we cannot conclude that it awarded any damages based on purported repair work not covered by the policies. See A Tumbling–T Ranches, 222 Ariz. at 543, ¶ 98, 217 P.3d at 1248 (appellate court "will uphold a general verdict if evidence on any one count, issue, or theory is sufficient to sustain the verdict").[14]

## J. Attorney's Fees Awarded by the Court.

¶ 79 At the trial's conclusion, the superior court awarded Desert Mountain its attorney's fees and costs pursuant to A.R.S. §§ 12–341 (2003) and –341.01(A) (2003). Liberty Mutual contends the court abused its discretion by finding Desert Mountain was the successful party in the litigation. It argues that in light of pretrial rulings that limited the damages Desert Mountain could recover and the court's entry of summary judgment dismissing the claim for breach of the duty of good faith, and because the jury ultimately awarded Desert Mountain only about a third of what it sought at the conclusion of the trial, Liberty Mutual should be considered the successful party, or in the alternative, there was no successful party for purposes of § 12–341.01(A).[15]

¶ 80 The superior court has broad discretion in deciding whether to award attorney's fees under A.R.S. § 12–341.01(A). Associated Indem. Corp. v. Warner, 143 Ariz. 567, 570, 694 P.2d 1181, 1184 (1985). On review, we decide not "whether the judges of this court would have made an original like ruling, but whether a judicial mind, in view of the law and circumstances, could have made the ruling without exceeding the bounds of reason. We cannot substi-

---

14. Liberty Mutual does not argue the superior court denied it the right to have the jury enter separate (special) verdicts on the various components of Desert Mountain's damage claim. The insurer therefore may not argue it was prejudiced because the jury issued only a general verdict. See Dunlap v. Jimmy GMC of Tucson, Inc., 136 Ariz. 338, 341–42, 666 P.2d 83, 86–87 (App.1983) ("request for special verdicts would have been the proper method of assuring that the award of damages was not partly based on a count which had been erroneously submitted to the jury").

15. Both parties sought their attorney's fees after the trial. Liberty Mutual asked for $803,776; Desert Mountain asked for $877,013. The court denied Liberty Mutual's request and entered an award of $725,000 in favor of Desert Mountain. On appeal, Liberty Mutual does not contest the reasonableness of the amount of fees the court awarded Desert Mountain.

tute our discretion for that of the trial judge." *Id.* at 571, 694 P.2d at 1185 (quoting *Davis v. Davis*, 78 Ariz. 174, 179, 277 P.2d 261, 265 (1954) (Windes, J., specially concurring)). Thus, we will affirm the superior court's award of fees if it is supported by "any reasonable basis." *Maleki v. Desert Palms Prof'l Props., L.L.C.*, 222 Ariz. 327, 334, ¶ 32, 214 P.3d 415, 422 (App.2009) (citation omitted).

¶ 81 "The decision as to who is the successful party for purposes of awarding attorneys' fees is within the sole discretion of the trial court, and will not be disturbed on appeal if any reasonable basis exists for it." *Id.*, ¶ 35 (quoting *Sanborn v. Brooker & Wake Prop. Mgmt., Inc.*, 178 Ariz. 425, 430, 874 P.2d 982, 987 (App.1994)). The successful party is the one that is the "ultimate prevailing party" in the litigation. *U.S. Insulation, Inc. v. Hilro Constr. Co.*, 146 Ariz. 250, 259, 705 P.2d 490, 499 (App.1985). A party can be the successful party even if it "does not recover the full measure of relief it requests." *Sanborn*, 178 Ariz. at 430, 874 P.2d at 987.

¶ 82 Desert Mountain initially sought approximately $7.3 million in damages from Liberty Mutual. The superior court, however, held Desert Mountain could not recover from Liberty Mutual any amounts the developer had received in settlements with contractors and its other insurers. Liberty Mutual filed a host of motions for partial summary judgment prior to trial. As noted, the court dismissed the bad faith claim; it made other rulings that narrowed the scope of contract damages available to Desert Mountain, but it also denied some of Liberty Mutual's motions and entered orders approving Desert Mountain's interpretation of certain key policy terms. At the end of the day, as we have said, Desert Mountain asked the jury to award it $1,500,000 in damages; the jury's verdict was for $500,000.

¶ 83 In addition, the record shows intermittent unsuccessful settlement offers by both sides. The complaint was filed in May 2003; Desert Mountain made an offer of judgment of $1.5 million in February 2004. For its part, Liberty Mutual served a $75,000 offer of judgment in August 2005. The record does not disclose that Liberty Mutual ever offered more than $75,000 in settlement.

¶ 84 Liberty Mutual argues the determination of the "successful" party for purposes of a fee award under A.R.S. § 12–341.01(A) depends on "the totality of the litigation." *See Schwartz v. Farmers Ins. Co. of Ariz.*, 166 Ariz. 33, 38, 800 P.2d 20, 25 (App.1990) ("The trial court may rightfully utilize a 'percentage of success factor' or a 'totality of the litigation' test ... to determine who was the successful party."). At issue in *Schwartz* was a claim for the value of a car that was destroyed in a collision. The insurance company offered $11,000; the insured demanded $14,000 and the jury awarded $12,000 but found for the insurer on the insured's claim for bad faith. *Id.* at 34–35, 800 P.2d at 21–22. This court affirmed the superior court's decision that the insurer "was the successful party under the totality of the litigation." *Id.* at 38–39, 800 P.2d at 25–26.

¶ 85 *Schwartz* does not compel us to reverse the superior court's exercise of discretion in this case. While Liberty Mutual succeeded in obtaining a pretrial ruling that it was not liable for bad-faith damages, we do not think that or the superior court's (correct) order setting off Desert Mountain's prior settlements necessarily dictated the result of the "successful party" analysis under A.R.S. § 12–341.01(A). To be sure, Desert Mountain's case was reduced considerably when the court ruled it could not recover from Liberty Mutual any amounts it already had received in settlements with other parties, but the effect of that ruling was a fortuity from the perspective of Liberty Mutual because it had nothing to do with the merits of the insurer's substantive defenses to coverage. Under the circumstances, including Liberty Mutual's failure to make a significant settlement offer, we cannot conclude the superior court abused its discretion in finding Desert Mountain was entitled to its attorney's fees and costs as the successful party in the litigation pursuant to A.R.S. § 12–341.01(A).

## II. Desert Mountain's Cross–Appeal.

¶ 86 Desert Mountain argues the superior court erred by entering partial summary

judgment in favor of Liberty Mutual on certain elements of Desert Mountain's claims and in precluding Desert Mountain from recovering internal costs it contends it incurred as a result of Liberty Mutual's breach.

## A. Motions for Summary Judgment.

### 1. Standard of review.

¶ 87 We review the grant of summary judgment *de novo,* viewing the evidence and reasonable inferences in favor of the non-moving party. *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 482, ¶ 13, 38 P.3d 12, 20 (2002). Summary judgment is appropriate "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(c)(1).

### 2. Damages caused by repair of defectively compacted soil: "Get-to" damages.

¶ 88 This court held in *Advance Roofing* that faulty workmanship does not constitute an "occurrence" within the meaning of the standard CGL insurance policy. 163 Ariz. at 482, 788 P.2d at 1233. Nevertheless, although costs incurred to repair a construction defect normally are not covered, damage to other property caused by or resulting from the defect may be covered. *See Lennar Corp.,* 214 Ariz. at 262, ¶ 20, 151 P.3d at 545. Consistent with those rules, the superior court in this case held in a pretrial order that "repair of the defective workmanship [i.e., faultily compacted soil] is not covered by the Liberty Mutual policies."

¶ 89 Desert Mountain argues the superior court erred, however, by ruling on summary judgment that it could not recover some $136,000 in expenses incurred in repairing damage to non-defective property that occurred during the repair of defective property. To explain, the record shows that to repair some of the poorly compacted soil, Desert Mountain had to damage or destroy walls, floors, slabs or other portions of the homes that had not been affected by the poorly compacted soil. (For example, Desert Mountain sometimes had to drill through perfectly fine floors to gain access to the soil that needed to be remediated.) The court's ruling precluded Desert Mountain from recovering the expenses of repairing damage (the parties called them "get-to" damages) that occurred in the process of remedying defective soil compaction.

¶ 90 Desert Mountain argues the removal or destruction of non-defective property required to repair poorly compacted soil was covered under the policies because it constituted property damage caused by the defective work. In support, it cites *Dewitt Construction, Inc. v. Charter Oak Fire Insurance Co.,* 307 F.3d 1127 (9th Cir.2002). Applying Washington law, the court in that case held that when a subcontractor had to remove and destroy undamaged and non-defective work of other subcontractors to remedy its own defective construction, the damage was covered by the insured subcontractor's CGL policy. *Id.* at 1134.

¶ 91 In our view, however, the expense of removing or repairing non-defective property under the circumstances presented here more properly is characterized as a cost of repairing the defect. The removal or destruction of non-defective property required to repair poorly compacted soil is not damage caused by the poorly compacted soil. Rather, it is damage caused by the *repair* of the poorly compacted soil.[16] Therefore, because the cost of repairing the defect is not recoverable under a CGL policy in Arizona, *Advance Roofing,* 163 Ariz. at 482, 788 P.2d at

---

16. That Desert Mountain had to destroy or damage slabs or walls that were not damaged by soil settlement in order to "get to" the subsurface to repair the soil is unfortunate but not determinative of the coverage issue. If the only way repair crews could access a certain area of poorly compacted soil was to rent a special piece of expensive equipment that could drill laterally through dozens and dozens of feet of earth to reach the affected location, the rental of the special drill would not be covered because it would be just one of many expense items incurred in repairing the defective soil. That repair crews in this case were required on occasion to drill through a floor to get to the soil should not change the outcome.

1233, the superior court did not err by ruling that costs incurred in "getting to" the defect were not covered under the policies at issue.

¶ 92 Authorities from other jurisdictions support this conclusion. *See OneBeacon Ins. Co. v. Metro Ready–Mix, Inc.*, 427 F.Supp.2d 574, 576–77 (D.Md.2006) (demolition and reconstruction of pilings and columns necessitated by repair of defective grout work not covered as an "occurrence" under CGL policy); *Nas Sur. Group v. Precision Wood Prods., Inc.*, 271 F.Supp.2d 776, 783 (M.D.N.C.2003) ("costs incurred … to repair drywall, repaint walls and reinstall sinks, wiring and plumbing incident to the replacement of … defective workmanship" were not an "occurrence" under CGL policy because they were foreseeable costs associated with the repair of faulty workmanship); *H.E. Davis & Sons v. North Pac. Ins. Co.*, 248 F.Supp.2d 1079, 1085 (D.Utah 2002) (costs incurred in removing undamaged concrete footings in order to remedy defectively compacted soil not covered as "property damage" under CGL policy); *Woodfin Equities Corp. v. Harford Mut. Ins. Co.*, 110 Md.App. 616, 678 A.2d 116, 131–32 n. 8 (1996) ("Voluntarily pulling up carpeting or breaking through dry-wall to access the [defective] HVAC units is not [covered as] property damage [under CGL policy]; it is the cost incurred in replacing and repairing the HVAC systems."), *aff'd in part and rev'd in part on other grounds Harford Mut. Ins. Co. v. Woodfin Equities Corp.*, 344 Md. 399, 687 A.2d 652 (1997); *Gen. Accident Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc.*, 716 A.2d 751, 758–59 (R.I. 1998).

### 3. Breach of the duty of good faith.

¶ 93 Desert Mountain also argues the superior court erred by granting Liberty Mutual's motion for partial summary judgment on the bad faith claim. Desert Mountain contends questions of fact existed as to whether the insurer acted in bad faith and points to evidence that Liberty Mutual denied cover-

age without interviewing any Desert Mountain employee, retaining an expert to examine the claims or visiting the site.

¶ 94 An insured alleging breach of the duty of good faith must show both that the insurer acted unreasonably in investigating, evaluating or processing the claim and that it either knew or was conscious of the fact that it acted unreasonably. *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 238, ¶ 22, 995 P.2d 276, 280 (2000). An insurer's failure to pay a claim is not unreasonable when the claim's validity is "fairly debatable." *Rawlings v. Apodaca*, 151 Ariz. 149, 156, 726 P.2d 565, 572 (1986). Similarly, an insurer's reasonable but incorrect policy interpretation does not, by itself, constitute bad faith. *Aetna Cas. & Sur. Co. v. Superior Court*, 161 Ariz. 437, 440, 778 P.2d 1333, 1336 (App.1989). Finally, our review of the superior court's decision is limited to the record before the court when it considered the motion for summary judgment. *Brookover v. Roberts Enters., Inc.*, 215 Ariz. 52, 55, ¶ 8, 156 P.3d 1157, 1160 (App.2007); *GM Dev. Corp. v. Cmty. Am. Mortgage Corp.*, 165 Ariz. 1, 4, 795 P.2d 827, 830 (App.1990).

¶ 95 We conclude that on the record before the superior court at the time of the summary judgment briefing, there existed no genuine issue of material fact as to whether Liberty Mutual acted unreasonably, or if it did, that it knew or was conscious that it had acted unreasonably. For the most part, Desert Mountain's response to Liberty Mutual's motion for partial summary judgment on the bad faith claim argued that Liberty Mutual's decision to deny coverage was not well-founded.[17] In its letter denying coverage, dated February 12, 2003, Liberty Mutual cited the voluntary payments and known loss exclusions as bars to coverage. As we have held, neither of those exclusions barred coverage of Desert Mountain's damages. In its response to the motion for summary judgment, however, Desert Mountain failed to

---

**17.** Desert Mountain supports its cross-appeal with dozens of citations to trial evidence that it contends proves Liberty Mutual engaged in bad faith by denying the claim. Our review on appeal from the court's grant of summary judgment, however, is confined to the evidence avail-

able to the court at the time it ruled on the motion. We do not consider evidence that Desert Mountain failed to submit in response to the motion for summary judgment but offered at trial years later.

offer evidence that Liberty Mutual's policy positions were unreasonable or not fairly debatable. And an insurer does not commit bad faith simply by asserting a policy defense that turns out to be invalid or unfounded. *See Rawlings*, 151 Ariz. at 156, 726 P.2d at 572; *Aetna Cas. & Sur. Co.*, 161 Ariz. at 440, 778 P.2d at 1336.

¶ 96 Desert Mountain argues, however, that Liberty Mutual engaged in bad faith by delaying its response to the demand for coverage and by issuing its denial letter without properly investigating the claim. It was undisputed, however, that in June 2001, in response to the May 16, 2001 notice of claim, Liberty Mutual asked Desert Mountain to furnish it nine categories of documents relating to the claim. Desert Mountain correctly does not argue on appeal that Liberty Mutual's request for documentation was unreasonable. The insurer asked, for example, for documents concerning homeowner complaints, the contracts between Desert Mountain and Weitz, any other insurance policies on the project, repair work already done and payments already made, Frank's reports, the proposed repair schedule and any notices of claim given to Weitz or to other subcontractors. Desert Mountain did not furnish the insurer with documents regarding homeowner complaints (which Yehling admitted Strickland told him were "important") or documentation of completed repairs until October 2002.[18] Liberty Mutual notified Desert Mountain of its coverage decision on February 12, 2003, four months after Desert Mountain finally delivered the last of the documents.

¶ 97 We conclude the limited evidence Desert Mountain offered in response to Liberty Mutual's motion for summary judgment created no genuine issue of fact with respect to the claim for breach of duty of good faith and fair dealing. *See Zilisch*, 196 Ariz. at 238, ¶ 22, 995 P.2d at 280 (bad faith requires proof of unreasonable acts *plus* insurer's knowledge or consciousness of unreasonableness). The facts Desert Mountain offered showed only a lag in time between Desert Mountain's notice of claim and Liberty Mutual's coverage decision, although it was undisputed that the insurer's final decision came only four months after Desert Mountain fully complied with the insurer's request for information regarding the claim. As a result, we affirm the court's grant of summary judgment. *See id.; see also Lasma Corp. v. Monarch Ins. Co. of Ohio*, 159 Ariz. 59, 63–64, 764 P.2d 1118, 1122–23 (1988) (bad faith claim should not go to jury when evidence showed claim was "fairly debatable"); *Voland v. Farmers Ins. Co. of Ariz.*, 189 Ariz. 448, 453–54, 943 P.2d 808, 813–14 (App.1997).

## B. "Markup" Damages.

¶ 98 Before trial, Desert Mountain sought as damages a 10 percent "markup" on the overall repair expenses it incurred to compensate it for the time its employees devoted to the repair efforts and the lawsuit against Weitz. The superior court, however, granted Liberty Mutual's motion *in limine* to preclude the markup. On appeal, Desert Mountain argues the court erred because the markup fairly represented costs Desert Mountain incurred as a direct result of Liberty Mutual's breach of contract.

¶ 99 Although we ordinarily review the superior court's admission or exclusion of evidence under a clear abuse of discretion standard, we review questions of alleged legal error, including those related to evidentiary rulings, *de novo*. *Yauch v. S. Pac. Transp. Co.*, 198 Ariz. 394, 399, ¶ 10, 10 P.3d 1181, 1186 (App.2000).

¶ 100 Desert Mountain's first argument in support of its entitlement to the markup rests on the policies' "Supplementary Payments" provision, which stated, "[Liberty Mutual] will pay, with respect to any claim we investigate or settle, or any 'suit' against an insured we defend ... [a]ll reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or 'suit' ...." Desert Mountain asserts that because Liberty Mutual breached its contractual duties to investigate the claim, acknowledge coverage and prosecute a subrogation claim against Weitz,

---

18. Desert Mountain did not dispute its failure to provide all requested documents until October 2002, but asserted that it provided the documents as they "became available."

Desert Mountain was forced to divert its own resources to such tasks and should be entitled to recover the 10 percent markup to compensate it for doing so.

¶ 101 We conclude the "Supplementary Payments" provision does not support Desert Mountain's position. The policy language only obligates the insurer to pay expenses the insured incurs at its request. Because Desert Mountain does not contend Liberty Mutual made any such requests, the "Supplementary Payments" provision is inapplicable.

¶ 102 Desert Mountain also argues the markup fairly represented the internal expenses it incurred as a foreseeable consequence of Liberty Mutual's breach of contract. It contends, for example, that if Liberty Mutual had accepted coverage of the claim, Desert Mountain employees would not have had to manage the repair program or oversee the prosecution of the construction defect lawsuit against Weitz. But in contrast to the verifiable repair expenses and attorney's fees and out-of-pocket costs it offered in evidence, the markup Desert Mountain sought did not represent the actual cost of the time its employees devoted to managing the repairs and overseeing the litigation. In the absence of evidence of the actual value of the time its employees actually spent on those tasks, the jury could not have awarded damages on this element of Desert Mountain's claim.

¶ 103 Desert Mountain also argues it is entitled to the markup as compensation for the disruption that Liberty Mutual's breach caused to its business. It cites *Reliable Electricity Co. v. Clinton Campbell Contractor, Inc.*, 10 Ariz.App. 371, 375–77, 459 P.2d 98, 102–04 (1969), for the proposition that an implied overhead factor is recoverable in a claim for breach of contract. At issue in that case, however, were damages representing manufacturing inefficiencies caused by damage to a brick kiln. *Id.* at 373, 459 P.2d at 100. We will not apply a manufacturing overhead cost factor under these circumstances. Moreover, Desert Mountain offered

no evidence to support its contention that the 10 percent markup it sought actually represented the cost of the business disruption it contended it incurred as a result of Liberty Mutual's breach.[19]

¶ 104 An insurer's wrongful failure to indemnify or defend its insured "does not expose the insurance carrier to greater liability than that contractually provided in the policy." *State Farm Mut. Auto. Ins. Co. v. Paynter*, 122 Ariz. 198, 204, 593 P.2d 948, 954 (App.1979). Desert Mountain failed to show that but for Liberty Mutual's breach it would not have incurred the internal costs it sought to recover by way of the markup. As a result, the superior court did not err in granting Liberty Mutual's motion *in limine* on so-called overhead damages.

## CONCLUSION

¶ 105 We affirm the superior court's rulings and the judgment it entered on the jury's verdict. In our discretion we decline to award either side its attorney's fees or costs on appeal.

CONCURRING: PATRICIA A. OROZCO, Presiding Judge and JON W. THOMPSON, Judge.

---

**19.** Desert Mountain did not present evidence of lost profits in support of this claim; instead, it argued in general fashion, for example, that because some of its employees were busy with matters concerning the construction defects, they could not devote their full attention to their jobs. Its argument does not acknowledge the possibility that attending to construction defects was within the job descriptions of the affected employees.