IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

DIANA GLAZER, the surviving spouse of MICHAEL GLAZER, deceased,
on her own behalf and as statutory trustee for LINDSAY GLAZER and
DAVID GLAZER, surviving children of MICHAEL GLAZER; DIANA
GLAZER, as surviving parent of SYDNEY GLAZER, deceased,
*Plaintiff/Appellee*,

*v.*

STATE OF ARIZONA, a government entity, *Defendant/Appellant.*

No. 1 CA-CV 12-0572
FILED 4-3-2014

---

Appeal from the Superior Court in Maricopa County
No. CV2009-001261
The Honorable John Christian Rea, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Daniel P. Schaack, Fred Zeder
*Counsel for Defendant/Appellant*

The Leader Law Firm, Tucson
By John P. Leader
*Counsel for Plaintiff/Appellee*

## OPINION

Judge Samuel A. Thumma delivered the opinion of the Court, in which Presiding Judge Randall M. Howe and Judge Patricia A. Orozco joined.

**T H U M M A,** Judge:

¶1        The State of Arizona appeals from a substantial jury verdict for plaintiffs arising out of a multiple-fatality car crash on Interstate 10. The State argues the superior court erred in: (1) failing to grant the State immunity as a matter of law; (2) denying a motion to preclude testimony from one of plaintiff's experts and (3) failing to grant a new trial when the jury allocated all fault to the State. Because the superior court did not err, the judgment is affirmed.

## FACTS[1] AND PROCEDURAL HISTORY

¶2        This case arises out of an August 2007 car crash that injured plaintiff Diana Glazer and killed her husband and their minor daughter. The Glazers were traveling west on I-10 in a minivan. Melissa Sumpter was driving east on I-10 in a sport utility vehicle. The crash occurred near milepost 171, south of Phoenix, on a portion of I-10 built in 1967. The speed limit was 75 miles per hour and traffic was moving at or above the speed limit.

¶3        Sumpter moved her SUV into the left lane to pass a semi-trailer truck. The truck then moved into the passing lane that Sumpter was occupying, although her exact location relative to the truck was disputed. The truck's lane change resulted in Sumpter driving her SUV onto the shoulder. Although Sumpter avoided contact with the truck, she apparently tried to drive back onto I-10 and lost control, shooting across the median and into oncoming traffic. Sumpter's SUV crashed head-on into the Glazers' van, killing Glazer's husband and young daughter and

---

[1] This court "view[s] the evidence in the light most favorable to upholding the jury's verdict." *Powers v. Taser Int'l, Inc.*, 217 Ariz. 398, 399 n.1, ¶ 4, 174 P.3d 777, 778 n.1 (App. 2007).

seriously injuring Glazer. The semi-trailer truck did not stop. In fact, although the existence of the truck was not disputed, neither the truck nor its driver was ever identified.

**¶4**       Glazer sued the State alleging negligence for failing to have installed "median barriers . . . separating the eastbound and westbound lanes" of I-10 in the area of the crash. Before, during and after trial, the State made various filings relevant to this appeal. The State filed a timely notice pursuant to Arizona Revised Statutes (A.R.S.) section 12-2506(B) (2014)[2] and Arizona Rule of Civil Procedure 26(b)(5), naming Sumpter and the driver of the truck as nonparties at fault. The State sought summary judgment pursuant to A.R.S. § 12-820.03, an affirmative defense applicable to a claim for "an injury arising out of a plan or design for construction" of a highway if certain conditions are met. Finding the statute did not apply to Glazer's claim, the superior court denied the motion.

**¶5**       Glazer offered expert testimony from transportation engineer Dr. Robert Bleyl, who opined that the State should have installed a median barrier in the area prior to the crash. The State moved to preclude that testimony and requested an evidentiary hearing, claiming Dr. Bleyl was not qualified and used improper methodology. The superior court denied the State's motion without an evidentiary hearing. During trial, after an evidentiary hearing outside the presence of the jury, the court found Dr. Bleyl had shown a proper foundation to discuss prior accidents as a basis for his opinion. At trial, Dr. Bleyl testified that the State should have installed a median barrier in the area where the crash occurred sometime after 2000 but before the crash, and provided bases for his testimony.

**¶6**       At the close of Glazer's case, at the close of the evidence and then again after the verdict, the State moved for judgment as a matter of law pursuant to Arizona Rule of Civil Procedure 50, challenging the superior court's rulings regarding A.R.S. § 12-820.03 and the admissibility of Dr. Bleyl's testimony. The superior court denied those motions.

**¶7**       The verdict form listed the State, Sumpter and the unknown truck driver as each having potential fault for the crash. After an eight-day trial, the jury awarded Glazer $7,800,000 in damages, apportioned all fault

---

[2] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

to the State and apportioned no fault to Sumpter or the unknown truck driver. The State moved for a new trial claiming the verdict was excessive and not justified by the evidence and again challenging Dr. Bleyl's testimony. The superior court denied the motion. This court has jurisdiction over the State's timely appeal from the resulting judgment pursuant to A.R.S. §§ 12-2101(A)(1), (A)(5)(a).

## DISCUSSION

¶8 The State argues the superior court erred in: (1) failing to enter judgment in favor of the State as a matter of law pursuant to A.R.S. § 12-820.03; (2) overruling the State's objections to Dr. Bleyl's testimony and (3) failing to grant a new trial after the jury assigned all fault to the State. This court addresses these arguments in turn.

## I. The Superior Court Did Not Err In Finding A.R.S. § 12-820.03 Did Not Apply To Glazer's Claim.

¶9 The resolution of the State's claimed immunity implicates the State's duty to keep public highways reasonably safe for travel, the text of A.R.S. § 12-820.03 and the application of those legal concepts to the claim Glazer asserted and presented to the jury.

### A. The State's Duty To Keep Public Highways Reasonably Safe For Travel.

¶10 "There is a relationship between the State [of Arizona] and a traveler using a public highway which imposes a legal obligation upon the State for that person's safety. More specifically, the State has a duty to keep its highways reasonably safe for travel." *Bach v. State*, 152 Ariz. 145, 147, 730 P.2d 854, 856 (App. 1986). The Arizona Supreme Court repeatedly has recognized this common law duty for nearly ninety years. *See, e.g., Dunham v. Pima County*, 161 Ariz. 304, 306, 778 P.2d 1200, 1202 (1989); *Barnes v. City of Tucson*, 157 Ariz. 566, 568, 760 P.2d 566, 568 (1988); *Coburn v. City of Tucson*, 143 Ariz. 50, 51, 691 P.2d 1078, 1079 (1984); *Beach v. City of Phoenix*, 136 Ariz. 601, 602, 667 P.3d 1316, 1317 (1983); *Ariz. State Highway Dep't v. Bechtold*, 105 Ariz. 125, 129, 460 P.2d 179, 183 (1969); *City of Phoenix v. Mayfield*, 41 Ariz. 537, 548, 20 P.2d 296, 300 (1933); *City of Phoenix. v. Clem*, 28 Ariz. 315, 327, 237 P. 168, 172 (1925).

¶11 Although "not an insurer of those who travel," the State is "bound to keep its streets safe for travel" by exercising ordinary care and caution. *Clem*, 28 Ariz. at 327, 237 P.2d at 172. This duty includes an obligation "to erect railings or barriers along the highway at places where

4

they are necessary to make the highway safe and convenient for travelers in the use of ordinary care." *Mayfield*, 41 Ariz. at 548, 20 P.2d at 300 (quoting *Johnson v. State,* 186 App. Div. 389, 391, 173 N.Y. Supp. 701, 703 (1919)). More specifically, the State has a duty "to place proper barriers, railings, guards and/or warning signs at dangerous places on a highway when necessary for travelers' safety." *Bach*, 152 Ariz. at 148, 730 P.2d at 857 (citing authority); *see also Mayfield*, 41 Ariz. at 546, 20 P.2d at 299 (noting government entity "is liable for personal injuries caused by the failure to erect guards or railings to prevent accidental driving into or over . . . excavations, embankments, or canals"). Even where an "improvement is not defective when made, but later becomes so, the rule is that the [State] must have actual notice of a defect, or the defect must have existed a sufficient length of time to imply notice, before [the State] is guilty of actionable negligence." *Clem*, 28 Ariz. at 327, 237 P.2d at 172.

¶12        Given this duty, the superior court in this case properly instructed the jury that:

> The [S]tate has [a] duty to keep its highways reasonably safe for travel. That duty includes the duty to place proper barriers, railings, guards and/or warning signs at dangerous places on a highway when necessary for travelers' safety.
>
> The mere fact that an accident occurred does not compel the conclusion that a condition was unreasonably dangerous.

### B.    The Text Of A.R.S. § 12-820.03.

¶13        Titled "Affirmative defense," A.R.S. § 12-820.03 reads:

> Neither a public entity nor a public employee is liable for an injury arising out of a plan or design for construction or maintenance of or improvement to highways, roads, streets, bridges, or rights-of-way if the plan or design is prepared in conformance with generally accepted engineering or design standards in effect at the time of the preparation of the plan or design, provided, however, that reasonably

> adequate warning shall be given as to any
> unreasonably dangerous hazards which would
> allow the public to take suitable precautions.

This statute was enacted in 1984 in a slightly different form as part of the Actions Against Public Entities or Public Employees Act (the Act), codified at A.R.S. §§ 12-820 - 826. The Act followed the Arizona Supreme Court's abolition of judicially-created State immunity for tort liability. *See Ryan v. State*, 134 Ariz. 308, 310, 656 P.2d 597, 599 (1982) (also encouraging the Legislature to address the issue), *superseded by the Act as stated in Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 16 P.3d 757 (2001) (3-2 decision); *Stone v. Ariz. Highway Comm'n*, 93 Ariz. 384, 392-93, 381 P.2d 107, 112-13 (1963), *superseded by the Act as stated in Backus v. State*, 220 Ariz. 101, 203 P.3d 499 (2009) (same); *see also Goss v. City of Globe*, 180 Ariz. 229, 232, 883 P.2d 466, 469 (App. 1994) (describing Act's history).

¶14　　　　As the Legislature declared when passing the Act,

> The [L]egislature recognizes the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity. On the other hand, the [L]egislature recognizes that, while a private entrepreneur may readily be held liable for negligence within the chosen scope of his activity, the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done. Consequently, it is hereby declared to be the public policy of this state that public entities are liable for acts and omissions of employees in accordance with the statutes and common law of this state. All of the provisions of [the Act] should be construed with a view to carry out the above legislative purpose.

A.R.S. § 12-820 (historical and statutory notes Laws 1984, Ch. 285, § 1). Thus, the Act directs broad common law liability for the State while, at the same time, listing certain exceptions to such liability, including the

affirmative defense in A.R.S. § 12-820.03.[3] Accordingly, in Arizona, "the right to sue the [S]tate is not a statutory grant, as is the case in several other states; rather, it is a common law rule in Arizona that the government is liable for its tortious conduct and immunity is the exception." *Pritchard v. State*, 163 Ariz. 427, 431, 788 P.2d 1178, 1182 (1990); *accord Galati v. Lake Havasu City*, 186 Ariz. 131, 134, 920 P.2d 11, 14 (App. 1996) ("The Act 'reaffirmed the now well settled common law notion that governmental immunity is the exception and liability the rule.'") (quoting *City of Tucson v. Fahringer*, 164 Ariz. 599, 600 n.4, 795 P.2d 819, 820 n.4 (1990)).

### C.    The Applicability Of A.R.S. § 12-820.03 To This Case.[4]

¶15    The relevant portion of I-10 was built in 1967 pursuant to a plan or design in existence at that time. Because Glazer conceded that no median barrier was required when the road was built in 1967, the State asserts she "conceded the foundation for A.R.S. § 12-820.03: [that I-10's] plan or design was prepared in conformance with generally accepted engineering or design standards in effect at the pertinent time," meaning "the statute's clear language immunizes the State from her claim." This argument, however, does not account for Glazer's claim as pled and the evidence she relied upon to support that claim (all of which focused on substantial, material changes occurring on I-10 within a decade or less before the crash) and the statutory "injury arising out of a plan or design" requirement for A.R.S. § 12-820.03 to apply.

¶16    In this case, the State could properly invoke the affirmative defense set forth in A.R.S. § 12-820.03 if Glazer's claim was:

---

[3] The Act also contains immunities, *see* A.R.S. §§ 12-820.01-.02, that the State does not press on appeal and are not addressed here, *see Torrez v. Knowlton*, 205 Ariz. 550, 552 n.1, ¶ 3, 73 P.3d 1285, 1287 n.1 (App. 2003). Given trial evidence suggesting the State had not considered a median barrier in the relevant location in the decade or more before the crash, these immunities may not have been applicable factually. *Goss*, 180 Ariz. at 232, 883 P.2d at 469 ("We do not believe [the Act's protection against liability] was meant to apply where no actual decision-making has occurred.").

[4] Glazer does not argue that A.R.S. § 12-820.03 is inapplicable because it was enacted after the relevant portion of I-10 was built. *Cf.* A.R.S. § 1-244.

1.     for an injury arising out of a plan or design

2.     for construction of I-10

3.     if the plan or design was prepared in conformance with generally accepted engineering or design standards in effect at the time of the preparation of the plan or design.

*Id.; see also Nat'l Bank of Ariz. v. Thruston*, 218 Ariz. 112, 119, ¶ 27, 180 P.3d 977, 984 (App. 2008) (noting that proponent has evidentiary burden to prove affirmative defense). As the superior court found, however, Glazer does not claim an injury arising out of a plan or design for construction of I-10 in 1967.[5]

¶17        As set forth in her complaint, Glazer's claim is that she and her family were injured by the State's failure to keep I-10 reasonably safe when it failed to install a median barrier necessitated by substantial, material changes occurring on I-10 within a decade (or less) before the 2007 crash. Glazer's complaint references such recent changes, alleging the State "knew or should have known that:"

- "fatal traffic collisions have been increasing in recent years;"
- "traffic counts are ever increasing on Arizona's highways,"
- the number of "collisions has also risen steadily over the last ten (10) years;"

---

[5] The State correctly notes Glazer's claim "is not a maintenance claim," adding a median barrier "is a safety feature," not "a maintenance item." *See also* A.R.S. § 12-820(3) ("'Maintenance' means the establishment or continuation in existence of facilities, highways, roads, streets, bridges or rights-of-way by a public entity and does not mean or refer to ordinary repair or upkeep."). Similarly, Glazer's claim is for the failure to install a median barrier on I-10 given substantial, material changes within a decade (or less) before the 2007 crash, not for an injury arising out of a plan or design for an improvement of I-10 in 1967.

- "the number of vehicles traveling" on the relevant portion of I-10 "has risen and continues to rise;"
- "the speed limits are higher now on the interstate highway system than they have been at any time in the State's history;"
- on I-10, "an out-of-control vehicle forced into the median could travel over the median into the opposing lanes of travel;"
- "the volume of traffic" on I-10 "where this fatal collision occurred was such that there was a significant risk of cross-over accidents;"
- "the installation of a median barrier on [I-]10 would significantly have reduced the risk of and/or prevented a cross-over accident in the area where this fatal collision occurred."

Nowhere does Glazer's complaint assert a claim "for an injury arising out of" the 1967 construction of I-10 or the plan or design used for that construction. Looking solely at a complaint's allegations, however, does not finally resolve the applicability of an affirmative defense.

¶18 During this case, Glazer has consistently characterized her claim as arising out of changes occurring on I-10 within a decade or less leading up to the 2007 crash. For example, in opposing the State's motion for summary judgment on A.R.S. § 12-820.03, Glazer stated that she did "not claim [her] injuries arose from a plan of design or construction. [She does] not challenge the design or construction of the roadway." Instead, Glazer "allege[s] that based on conditions arising long after the roadway was built," the State breached its duty by failing to install a median barrier. Glazer's trial evidence was consistent with the claim alleged in her complaint and in these pretrial filings.

¶19 Glazer's expert Dr. Bleyl testified that a median barrier was not required when I-10 was built in 1967 but that subsequent changes discussed more fully below meant the State should have considered installing a median barrier as early as 2000. Stated differently, Glazer's claim and Dr. Bleyl's testimony focus on changes occurring on I-10 within a decade (or less) before the 2007 crash, long after that portion of I-10 had

been planned, designed and built. Thus, the evidence considered by the jury focused on whether the State breached its duty to keep I-10 reasonably safe when it did not install a median barrier given changes occurring on I-10 less than a decade before the 2007 crash. Simply put, and using the statute's language, Glazer's claim, filings and evidence at trial did not involve a claimed "injury arising out of a plan or design" for the construction of I-10 in 1967, meaning A.R.S. § 12-820.03 did not apply.

¶20        By arguing that A.R.S. § 12-820.03 "immunizes public entities from claims for alleged highway defects when the highway's design met the standards that applied at the time of [the] design," the State effectively seeks to remove the "injury arising out of" limitation expressly set forth in the statute. However, "[e]ach word, phrase, clause and sentence [of a statute] must be given meaning so that no part will be void, inert, redundant, or trivial." *Deer Valley Unified Sch. Dist. No. 97 v. Houser*, 214 Ariz. 293, 296, ¶ 8, 152 P.3d 490, 493 (App. 2007). When statutory language is clear and unambiguous, a court must "follow the text as it is written." *Ariz. Farm Bureau Fed'n v. Brewer*, 226 Ariz. 16, 21, 243 P.3d 619, 624 (App. 2010) (citation omitted). This court is not free to ignore the "injury arising out of" statutory language, text that prompted the superior court to find that Glazer:

> do[es] not contend that the highway was unsafe as planned and designed in 1967. [She] allege[s] that the circumstances in 2007, the time of the accident, rendered the highway unreasonably unsafe. There is no appellate authority construing [A.R.S. §] 12-820.03 that is applicable here. Whatever the statute means, the Court does not construe it to grant the State immunity to properly design a highway in 1967 and then ignore the developments of 40 years in the speed, size, and volume of traffic that might render the highway no longer reasonably safe.

¶21        On appeal, the State argues that *Edwards v. Board of Supervisors*, 224 Ariz. 221, 229 P.3d 233 (App. 2010) –- the only appellate decision to apply A.R.S. § 12-820.03 -- and *Daniels v. Department of Transportation*, 474 S.E. 2d 26 (Ga. App. 1996) demonstrate it was entitled to immunity under A.R.S. § 12-820.03 as a matter of law. Neither case shows the superior court erred.

¶22        Unlike Glazer, the plaintiffs in *Edwards* alleged flood damage to their home arising out of the design and construction of a roadway system (which included a culvert drainage system) twenty years earlier. 224 Ariz. at 222, ¶ 9, 229 P.3d at 234. Unlike Glazer's claim, however, the plaintiffs in *Edwards* challenged the adequacy of a plan at the time it was built, which easily falls within the protection of A.R.S. § 12-820.03; because the undisputed evidence showed the culvert "was built according to generally accepted engineering and design standards in effect" when it was built, the court affirmed summary judgment for the defendant county. 224 Ariz. at 223, ¶ 14, 229 P.3d at 235. Unlike Glazer's claim, *Edwards* did not address a claim arising out of a substantial, material change in circumstances occurring decades after a highway was built. And unlike Glazer's claim, *Edwards* did not involve a claim that the State breached its long-recognized common law duty to keep highways reasonably safe for travel. Having not been asked to address a claim like Glazer's, *Edwards* does not resolve the issue raised here. *Cf. City of Bisbee v. Cochise Cnty.*, 52 Ariz. 1, 6, 78 P.2d 982, 984 (1938) ("The doctrine of stare decisis cannot be extended to implications from what was actually decided in a previous case.").

¶23        In *Daniels*, the Georgia Court of Appeals held that the State of Georgia was exempt from liability for an intersection design claim under the Georgia Tort Claims Act (GTCA). 474 S.E.2d at 27. In construing GTCA language similar, but not identical, to A.R.S. § 12-820.03, *Daniels* noted the intersection was designed in March 1940, when no design guidelines existed, adding "the first national design guide was approved" in October 1940. 474 S.E.2d at 27. *Daniels* went on to reject plaintiff's challenge to the intersection "under current design standards," alleging that Georgia "had a duty to upgrade the intersection to meet those standards." 474 S.E.2d at 27. There is nothing to suggest that *Daniels* was asked to address a claim arising out of a substantial, material change in circumstances occurring long after the design and construction of the intersection. Moreover, the statutory construction principles for the GTCA differ from those governing the Act. Arizona's Legislature has broadly "declared" the "public policy" of Arizona "that public entities are liable for acts and omissions of employees in accordance with the statutes and common law of this state" and that the Act "should be construed with a view to carry out the above legislative purpose." A.R.S. § 12-820 (historical and statutory notes Laws 1984, Ch. 285, § 1). By contrast, the GTCA states Georgia's "tort liability must therefore be limited" and "declared" a "public policy" that Georgia "shall only be liable in tort actions within the limitations of" the GTCA and "in accordance with the fair and uniform principles established in" the GTCA. Ga. St. § 50-21-21(a); *see also*

*Pritchard*, 163 Ariz. at 431, 788 P.2d at 1182 (distinguishing Arizona common law government liability from law in "several other states" where government liability is "a statutory grant"). Finally, *Daniels* "is not binding in any other case" in Georgia, *Mock v. Kroger Co.*, 598 S.E.2d 789, 791 (Ga. App. 2004), but is "physical precedent only since one judge concurred in the judgment," *Davis v. State*, 535 S.E.2d 528, 531 (Ga. App. 2000); *see also Daniels*, 474 S.E.2d at 28 (McMurray, P.J., concurring in judgment). Although cited by the Georgia Court of Appeals, *Daniels* has never been cited by the Georgia Supreme Court, in Arizona or in any other jurisdiction. Moreover, there is no indication that *Daniels* represents the law in any other jurisdiction, and the State concedes *Daniels* is not binding here.

¶24        Under the State's argument, a road built in 1967 –- or even a century ago -- if in compliance with generally accepted design standards when built, would never need to be updated. Under that view, the State could ignore significant changes in traffic volume and speed, vehicle size, accident frequency and similar developments without regard to safety or liability. The State cites no applicable case law supporting this view. Nor has the State shown how this view could peacefully coexist with the State's duty to keep roads reasonably safe for travel and the "common law rule in Arizona that the government is liable for its tortious conduct and immunity is the exception." *Pritchard*, 163 Ariz. at 431, 788 P.2d at 1182.

¶25        In sum, Glazer does not assert a claim for an injury arising out of a plan or design for the construction of I-10 in 1967. Nor is Glazer's claim an attempt to challenge the plan or design for construction of I-10 in 1967 simply based on the passage of time. *See Edwards*, 224 Ariz. at 222, ¶ 9, 229 P.3d at 234. Instead, Glazer's claim (with supporting trial evidence accepted by the jury) is that she and her family were injured by the State's failure to keep I-10 reasonably safe for travel when it failed to install a median barrier necessitated by substantial, material changes occurring on I-10 within a decade (or less) before the 2007 crash. Given the express terms of A.R.S. § 12-820.03, the State's common law duty to keep highways reasonably safe for travel and the nature of Glazer's claim and supporting evidence, the superior court did not err in finding that the affirmative defense contained in A.R.S. § 12-820.03 -- which is limited to claims for "an injury arising out of a plan or design" -- did not apply. *See Desert Mountain Props. Ltd. v. Liberty Mut. Fire Ins., Co.*, 225 Ariz. 194, 200, ¶ 12, 236 P.3d 421, 427 (App. 2010) (affirming, on de novo review, denial of judgment as a matter of law); *State v. Mabery Ranch, Co.*, 216 Ariz. 233, 239, ¶ 23, 165 P.3d 211, 217 (App. 2007) (affirming, on de novo review, denial of motion for summary judgment).

II.     **The Superior Court Did Not Err In Admitting Dr. Bleyl's Testimony.**

¶26        The State argues the superior court erred in failing to hold an evidentiary hearing and failing to make express findings in denying the State's motion in limine to preclude Dr. Bleyl's testimony. The State further argues the court abused its discretion in admitting the testimony because Dr. Bleyl was not qualified and used an unreliable methodology. This court "review[s] de novo matters involving interpretation of court rules," *State v. Fitzgerald*, 232 Ariz. 208, 210, ¶ 10, 303 P.3d 519, 521 (2013), and reviews a fact-based "decision to permit or exclude expert testimony for an abuse of discretion," *McMurty v. Weatherford Hotel, Inc.*, 231 Ariz. 244, 249, ¶ 10, 293 P.3d 520, 525 (App. 2013). As the proponent of the evidence, Glazer had the burden to show by a preponderance of the evidence that Dr. Bleyl's testimony was admissible. *See, e.g.*, Fed. R. Evid. 702 cmt. to 2000 amend. (citing *Bourjaily v. United States*, 483 U.S 171, 175 (1987)).

A.     **The Applicable Legal Standard.**

¶27        Effective January 1, 2012, Arizona Rule of Evidence 702 was amended to conform to Federal Rule of Evidence 702 and now provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Ariz. R. Evid. 702. As reflected in the Arizona Supreme Court's comments, this standard:

> is not intended to supplant traditional jury determinations of credibility and the weight to be afforded otherwise admissible testimony, nor is the amendment intended to permit a challenge to the testimony of every expert, preclude the testimony of experience-based experts, or prohibit testimony based on competing methodologies within a field of expertise. The trial court's gatekeeping function is not intended to replace the adversary system. Cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

Ariz. R. Evid. 702 cmt. to 2012 amend.; *see also State v. Bernstein*, 234 Ariz. 89, 94-97, ¶¶ 11-13, 317 P.3d 630, 635-37 (App. 2014) (discussing Ariz. R. Evid. 702 inquiry and factors). Because they are now textually identical, "federal court decisions interpreting [Federal Rule of Evidence 702] are persuasive but not binding" in interpreting Arizona Rule of Evidence 702. *Ariz. State Hosp. v. Klein*, 231 Ariz. 467, 473, ¶ 26, 296 P.3d 1003, 1009 (App. 2013). Similarly, the advisory committee notes to the 2000 amendments to Federal Rule of Evidence 702 provide guidance in interpreting Arizona Rule of Evidence 702. *See Sandretto v. Payson Healthcare Mgmt., Inc.*, No. 2 CA-CV 2013-0044, 2014 WL 949104, at *4, ¶ 14 (Ariz. App. Mar. 11, 2014).

**B.    The Superior Court Did Not Err In Failing To Hold A Pretrial Evidentiary Hearing On The Admissibility Of Dr. Bleyl's Testimony.**

¶28        The superior court denied the State's request for a pretrial evidentiary hearing to address the admissibility of Dr. Bleyl's testimony, finding such a hearing unnecessary. In addressing the admissibility of Dr. Bleyl's testimony, the parties provided voluminous written pretrial submissions. In addition, during trial, the court held an evidentiary hearing with Dr. Bleyl outside the jury's presence to determine whether he could testify "about previous accidents as a basis for his opinion on median barriers." Although a court has the discretion to hold a pretrial evidentiary hearing to address admissibility under Arizona Rule of

Evidence 702, such a hearing is not mandatory. *See State v. Perez*, 233 Ariz. 38, 43, ¶ 19, 308 P.3d 1189, 1194 (App. 2013) (citing *Ariz. State Hosp.*, 231 Ariz. at 474, ¶ 31, 296 P.3d at 1010); *see also Sandretto*, No. 2 CA-CV 2013-0044, 2014 WL 949104, at *4, ¶ 17 ("[A] trial court has great discretion whether to set a pretrial hearing to evaluate proposed expert testimony."). Given the parties' pretrial submissions, as well as the evidentiary hearing held during trial, the superior court did not abuse its discretion in denying the State's request for a pretrial evidentiary hearing. *Perez*, 233 Ariz. at 43, ¶ 19, 308 P.3d at 1194.

### C. The Superior Court Was Not Required To Make Findings Regarding The Admissibility Of Dr. Bleyl's Testimony.

¶29 The State argues the superior court erred in failing to make express admissibility or reliability findings under Arizona Rule of Evidence 702. The federal circuits are split on whether such findings are required. *Compare United States v. Mitchell*, 365 F.3d 215, 233-34 (3d Cir. 2004) (reviewing merits of ruling on admissibility of expert evidence "adher[ing] to the usual precepts of abuse-of-discretion review," where the trial court "elected not to make findings of fact or conclusions of law (written or oral)") *and Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 791-95 (6th Cir. 2002) (similar) *with United States v. Roach*, 582 F.3d 1192, 1207 (10th Cir. 2009) (noting trial court "is required to make specific, on-the-record findings that the testimony is reliable under *Daubert*"); *see also Mukhtar v. Cal. State Univ., Hayward*, 319 F.3d 1073, 1076-77 (9th Cir. 2003) (Reinhardt, J., dissenting from denial of rehearing en banc) (discussing various approaches). On the facts of this case, however, this court need not finally resolve whether such findings are ever required.

¶30 Because the superior court denied the State's motion in limine without an evidentiary hearing, this court may properly consider the same filings relied upon by that court in reaching that conclusion. Moreover, this court has the further benefit of the transcript of Dr. Bleyl's trial testimony –- both to the jury and outside of the presence of the jury -- to determine whether that testimony was properly admitted. Although this court encourages superior courts to make findings when addressing pretrial challenges pursuant to Arizona Rule of Evidence 702, and such findings may be required when evidence is *excluded*, in this case, the superior court did not err in failing to make express findings regarding the admissibility of Dr. Bleyl's trial testimony.

**D.  The Superior Court Did Not Abuse Its Discretion In Admitting Dr. Bleyl's Testimony Under Arizona Rule Of Evidence 702.**

**1.  Dr. Bleyl Was Qualified To Provide Expert Testimony.**

¶31        The State argues Dr. Bleyl was not qualified to testify on the standard of care regarding the need to install a median barrier because he has no highway design experience. A proponent of expert testimony must show by a preponderance of the evidence that a witness qualifies as an expert by "knowledge, skill, experience, training, or education" and that the "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Ariz. R. Evid. 702; *see also McMurty*, 231 Ariz. at 250-52, ¶¶ 15-18, 293 P.3d at 526-28 (noting expert may be qualified based on experience). "Whether a witness is qualified as an expert is to be construed liberally, and it would be an abuse of discretion 'to exclude testimony simply because . . . the proposed expert does not have the specialization that the court considers most appropriate.'" *State v. Delgado*, 232 Ariz. 182, 186, ¶ 12, 303 P.3d 76, 80 (App. 2013) (citation omitted). "If an expert meets the 'liberal minimum qualifications,' her level of expertise goes to credibility and weight, not admissibility." *Id.* at 186, ¶ 12, 303 P.3d at 80 (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997)).

¶32        Dr. Bleyl has a Ph.D. in transportation engineering; a master's degree in traffic engineering; a bachelor's degree in civil engineering and a "certificate of highway transportation," which he described as the equivalent of another master's degree. Dr. Bleyl has been a transportation engineer for more than 45 years; has worked as a traffic engineer with the Utah State Department of Highways; served as the Deputy Utah State Traffic Engineer and as the Assistant Director of the Bureau of Highway Traffic program at Pennsylvania State University. Dr. Bleyl spent 16 years teaching highway and traffic engineering at Yale and Penn State Universities and the University of New Mexico; is a Fellow and lifetime member of the Institute of Transportation Engineers; is a member of the National Society of Professional Engineers and is affiliated with the Transportation Research Board. On this record, the superior court did not abuse its discretion in finding Dr. Bleyl was qualified under Arizona Rule of Evidence 702(a) to testify as a standard of care expert. *See, e.g.*, *McMurtry*, 231 Ariz. at 251, ¶ 16, 293 P.3d at 527 (noting "degree of qualification [for an expert] goes to the weight given the testimony, not its admissibility").

### 2. Dr. Bleyl's Testimony Was Not The Product Of An Unreliable Methodology.

#### a. Dr. Bleyl's Methodology.

¶33 Dr. Bleyl testified that the State fell below the standard of care by failing to install a median barrier prior to the Glazer crash in August 2007. In part, Dr. Bleyl based his opinion on an American Association of State Highway and Transportation Officials 2002 Roadside Design Guide (the Design Guide). A chapter of the Design Guide titled "Median Barriers" discusses general guidelines called warrants that address when a median barrier may be appropriate, including a warrant developed by the California Department of Transportation (the CalTrans warrant). Dr. Bleyl testified that a median barrier may be required as a consequence of median width and traffic volume or as a consequence of crossover accidents. As applied, Dr. Bleyl conceded that the Design Guide did not require or recommend a median barrier "from a volume median width standpoint," given the width of the I-10 median at the location of the crash and that the warrants did not "by themselves require barriers." Instead, Dr. Bleyl based his opinion on a history of crossover accidents, including reliance on the CalTrans warrant, and a level-of-service analysis.

¶34 Dr. Bleyl focused on recent crossover accidents prior to the Glazer crash, near the crash site, to show I-10 had become unreasonably dangerous. He testified "there was a history of crossover accidents on I-10 in the vicinity of" the Glazer crash, citing 10 such accidents from March 2003 to August 2007, making it "[v]ery dangerous." In reaching that conclusion, Dr. Bleyl testified that under the CalTrans warrant, the number of crossover accidents in 2006 on I-10 in the vicinity of the Glazer crash indicated the State should have considered a median barrier. On cross-examination, Dr. Bleyl testified that the State "[s]hould have considered the installation of a barrier" in 2000 or 2001 and it would have been "within the next couple of years when [the median barrier] would actually be installed." When asked how the State, in 2000, could have anticipated accidents that did not occur until 2003 at the earliest, Dr. Bleyl noted the State had not preserved accident records predating 2003, meaning "the best" he could do was to use available data. Dr. Bleyl added that, in 2000, the State "would have had access to the accidents that happened in '95, '6, '7, '8, '9, and [the State] could have done this kind of analysis," adding "[i]n all probability" there would have been crossover accidents before 2003.

¶35        Dr. Bleyl's level-of-service analysis looked at hourly traffic volume by direction and lane, adjusted to reflect passenger car equivalents (taking into account the difference between trucks and cars). Analyzing the State's traffic volume data, Dr. Bleyl noted that traffic volume increased far more than anticipated and was "more than double what [the State] had projected 30 years" earlier. Dr. Bleyl also noted the speed limit increased from 65 to 75 miles per hour in 1999 or 2000. Using this analysis, traffic volumes for the relevant portion of I-10 were "getting to be extremely bad" by 2000, 2001 and 2002 and got even worse after that. After considering this information and the accident history, Dr. Bleyl testified that it was "the 2000, 2001 era when [the State] should have done something," adding "you really need to have a median barrier installed here for safety." Even independent of the crossover accident history assessment, Dr. Bleyl testified that the combination of factors "that we have for this location in the era of 2000 would have not only warranted a -- definitely warranted a barrier, should have been considered, but in all probability it would have been the safe thing to do." Dr. Bleyl added that the information from the State tracing back "over the last 12 years or more gave no indication whatsoever that [the State] even considered a median barrier for this general area."

### b.        Analysis Of Dr. Bleyl's Methodology.

¶36        As the proponent of Dr. Bleyl's testimony, Glazer was required to show by a preponderance of the evidence that "the testimony is the product of reliable principles and methods" that have been "reliably applied . . . to the facts of the case." Ariz. R. Evid. 702(c), (d). The State argues that Dr. Bleyl's testimony was inadmissible because (1) the Design Guide does not require a barrier for medians as wide as the relevant portion of I-10; (2) he testified a median barrier should have been considered as early as 2000, but based his opinion on a history of crossover accidents starting in 2003 and (3) he used an incorrect definition of "crossover accident." The court addresses the State's arguments in turn.

¶37        The Design Guide includes a chart titled "Suggested guidelines for median barriers on high-speed roadways," stating "barrier not normally considered" for medians more than 50 feet wide. Where the Glazer crash occurred, the I-10 median is approximately 80 feet wide. Dr. Bleyl conceded that the Design Guide did not require or recommend a median barrier "from a volume median width standpoint." Dr. Bleyl testified that the relevant portion of I-10 "does not meet" the chart guidelines, adding "[w]e're not dealing with that [the chart guidelines] in this particular case." The Design Guide expressly states the chart is

"suggested for use in the absence of more current (or site-specific) data." Given this limitation, Dr. Bleyl based his opinion on the highway-specific crossover accident history, including the CalTrans warrant, and level-of-service analysis, not the chart guidelines. In short, Dr. Bleyl conceded the Design Guide chart did not require a median barrier as relevant here and made it clear that he based his opinions on other grounds. On this record, the State has not shown the superior court abused its discretion in admitting Dr. Bleyl's testimony that a median barrier was required on grounds independent of the Design Guide chart.

¶38        The State is correct that Dr. Bleyl testified a median barrier should have been considered as early as 2000, but analyzed crossover accidents from 2003 to 2007 within four miles of the Glazer crash. Dr. Bleyl's opinion was that a median barrier should have been considered in 2000, and because it was not, the State breached its duty by failing to install such a barrier by the time of Glazer's crash in 2007. Accordingly, he testified it was appropriate to consider crossover accidents from 2003 to 2007. When pressed, Dr. Bleyl testified that the State had failed to retain information about crossover accidents prior to 2003, apparently given the passage of time. Accordingly, Dr. Bleyl testified, "the best" he could do was to use the data "that was available." The State did not dispute that pre-2003 crossover accident information had not been retained. Moreover, Dr. Bleyl testified his level-of-service analysis supported his opinions independent of the crossover accident history. Specifically, Dr. Bleyl testified that the combination of factors considered in his level-of-service analysis indicated a barrier should have been considered and was warranted "in the era of 2000." On this record, the superior court did not abuse its discretion in allowing Dr. Bleyl's testimony on crossover accidents that occurred from 2003 to 2007.

¶39        Finally, the State argues that, in applying the CalTrans warrant, Dr. Bleyl incorrectly considered all crossover accidents, not just those that resulted in collisions. In pressing this argument, the State does not cite to any trial evidence setting forth a definition of "crossover accident" that required a collision. Moreover, and setting aside the arbitrary nature of whether a crossover incident results in a collision, the superior court took measures, outside of the presence of the jury, to ensure the crossover accidents Dr. Bleyl testified about were similar to the Glazer crash. Dr. Bleyl's testimony to the jury then made clear that crossover accidents did not necessarily involve collisions. Although the State offered evidence implying that a warrant cited in the Design Guide may have required an actual collision, no such definition was received in evidence. Without such evidence, the State has not shown that the

superior court abused its discretion in allowing Dr. Bleyl's testimony on the point.

¶40    In finding the superior court did not abuse its discretion in admitting Dr. Bleyl's testimony, it merits mentioning that the State vigorously challenged his testimony during cross-examination. The State probed his conclusion that the State should have considered a median barrier beginning in 2000, a date the State suggested with supporting documentation may have been the product of an email from Glazer's counsel "admonishing him to come up with a concrete date." The State questioned Dr. Bleyl's methodology; his experience; his knowledge of practices used by various transportation departments and that the accidents he analyzed occurred after 2000. The State also presented its own expert to counter Dr. Bleyl's testimony and to discuss the appropriateness and effectiveness of a median barrier, causing the superior court to note that the competing experts used similar general methodologies. In the end, the jury apparently was persuaded by Dr. Bleyl's testimony. On this record, allowing the jury to make that determination based on competing expert evidence is what Arizona Rule of Evidence 702 contemplates. *See* Ariz. R. Evid. 702 cmt. to 2012 amend. ("Where there is contradictory, but reliable, expert testimony, it is the province of the jury to determine the weight and credibility of the testimony."). For these reasons, the superior court did not abuse its discretion in admitting Dr. Bleyl's testimony that the State fell below the standard of care by failing to install a median barrier prior to the Glazer crash.

## III.    The Superior Court Did Not Abuse Its Discretion In Denying The State's Motion For New Trial Regarding Apportionment Of Fault.

¶41    The jury found the State was entirely at fault for the crash, attributing no fault to Sumpter or the unknown truck driver. The State's motion for new trial argued the verdict could not stand because the jury failed to allocate any fault to these non-parties. On appeal, the State argues the superior court erred in denying that motion because "the jury ignored the undisputed evidence that either Sumpter or the unknown trucker" was at fault. The State had the evidentiary burden of proving that any non-party was at fault. *Ryan v. S.F. Peaks Trucking Co.*, 228 Ariz. 42, 48, ¶ 22, 262 P.3d 863, 869 (App. 2011). This court views the evidence in the light most favorable to sustaining the verdict, and if "any substantial evidence exists permitting reasonable persons to reach such a result," the judgment must be affirmed. *Hutcherson v. City of Phx.*, 192 Ariz. 51, 53, ¶ 13, 961 P.2d 449, 451 (1998). The issue on appeal is whether the superior

court abused its discretion in finding that the jury properly exercised its discretion in allocating fault. *See McBride v. Kieckhefer Assocs., Inc.*, 228 Ariz. 262, 266, ¶ 16, 265 P.3d 1061, 1065 (App. 2011) (noting denial of motion for new trial is reviewed for abuse of discretion).[6]

### A. The Jury Properly Could Have Allocated No Fault To Sumpter.

¶42          The trial evidence indicated Sumpter was driving at a reasonable speed when she drove off the road while attempting to pass the truck. The evidence indicated Sumpter took "evasive action" to respond to a "sudden emergency" when the truck began changing lanes. The evidence was conflicting about whether Sumpter was at fault for not stopping her car after she drove off the roadway and whether she could have prevented her car from shooting across the median into oncoming traffic. Similarly, there was conflicting evidence about whether Sumpter applied her brakes and what impact braking would have had on her ability to control her car. This court "must give 'full credence to the right of the jury to determine credibility, weigh the evidence, and draw justifiable conclusions therefrom.'" *McBride*, 228 Ariz. at 265, ¶ 11, 265 P.3d at 1064 (quoting *State v. Clifton*, 134 Ariz. 345, 348, 656 P.2d 634, 637 (App. 1982)). Although the jury properly could have made a different fault allocation, given this conflicting evidence, the jury was not required to attribute fault to Sumpter. Accordingly, the superior court did not abuse its discretion in denying the State's motion for new trial on that ground.

---

[6] In arguing this fact-intensive issue, the State relies on three distinguishable cases. *Ogden v. J.M. Steel Erecting, Inc.*, vacated a jury verdict allocating all fault to an employer, and none to an intoxicated employee whom the parties stipulated had killed a driver, in light of the stipulation. 201 Ariz. 32, 34, 36, ¶¶ 3-4, 16, 31 P.3d 806, 808, 810 (App. 2001). *Styles v. Ceranski* vacated a jury verdict apportioning all fault to an assisting doctor and none to the actual surgeon, where plaintiff's counsel had suggested that the jury hold the assisting doctor liable for the fault of both. 185 Ariz. 448, 449-52, 916 P.2d 1164, 1165-67 (App. 1996). Finally, *Smith v. Johnson* reversed a defense verdict, finding defendant's "negligence was a proximate cause of plaintiff's injuries," 183 Ariz. 38, 46, 899 P.2d 199, 207 (App. 1995), an issue unrelated to the non-party at fault allocation here.

## B. The Jury Properly Could Have Allocated No Fault To Truck Driver.

¶43 The State argues "overwhelming evidence" showed that the truck driver was at fault and that the truck's lane change was a violation of A.R.S. § 28-729(1), which directs that "[a] person shall drive a vehicle as nearly as practicable entirely within a single lane and shall not move the vehicle from that lane until the driver has first ascertained that the movement can be made with safety." Accordingly, the State argues the truck driver's lane change was negligence per se, meaning the jury was required to allocate fault to the truck driver.

¶44 The superior court properly instructed the jury on A.R.S. § 28-729(1) and negligence per se. The State addressed fault in closing arguments and asked the jury to attribute substantial fault to the truck driver. The remaining question, then, is whether the evidence required the jury to allocate fault to the truck driver.

¶45 The truck driver, of course, was not a trial witness. Moreover, neither party called Sumpter as a witness. The only eyewitness testimony the jury heard was a videotaped deposition of Jaclyn Cline. Cline was driving about a quarter of a mile behind Sumpter in the right lane at 75 to 80 miles per hour, keeping pace with traffic. Cline testified that when Sumpter was in the truck's blind spot while attempting a pass, "the truck began to merge over into that lane. [Sumpter] then dipped off the side of the road and tried to correct. The truck was, at that point, all the way over into her lane. She then, after trying to correct, knew that she would have hit the truck, dipped back into the road, at which point, [she] lost control of the vehicle." Cline's testimony was contradicted by other evidence in some key respects.

¶46 Although Cline testified Sumpter's SUV flipped numerous times while crossing the median, other evidence made it clear that Sumpter's SUV never flipped. A police officer testified Cline was "100% wrong" on the point, adding that eyewitnesses "get it wrong" sometimes. As another example, when expressing animosity toward the truck driver for not stopping, Cline testified that the truck driver knew what happened. When asked for the basis of her belief, Cline admitted "that would have to be my assumption because I wouldn't be able to know what he heard or saw or did," adding her testimony on the point was "really nothing more than speculation." Because Cline was the only eyewitness to the crash who testified at trial, and because the jury was not required to believe her testimony, the jury may have concluded that the

State failed to meet its burden of proving fault by the truck driver. *McBride*, 228 Ariz. at 265, ¶ 11, 265 P.3d at 1064.

¶47            Cline agreed that the truck driver was traveling at a reasonable speed and that the truck's lane change was "controlled." She could not recall if the truck was passing a vehicle. In addition, there was conflicting evidence about whether Sumpter was in the trucker's blind spot. Given the conflicting evidence, the jury could have found that the truck driver was required to change lanes based on traffic or could have found Sumpter was in the truck's blind spot when the truck changed lanes and, as a result, refrained from assigning fault to the truck driver. *See Ogden*, 201 Ariz. at 36, ¶ 15, 31 P.3d at 810.

¶48            The State argues that even assuming Sumpter was in the truck's blind spot, the truck driver's "mistaken belief that he could safely change lanes cannot excuse his maneuver." In determining whether the truck driver complied with A.R.S. § 28-729(1), the jury properly could have considered surrounding circumstances. *See Ray v. Starr*, 24 Ariz. App. 435, 437, 539 P.2d 549, 551 (1975). Given the conflicting evidence about the truck's lane change, the jury was not required to find that the truck driver failed to act as a reasonably careful person would under the circumstances. Moreover, even assuming negligence per se by the truck driver, the State also was required to prove causation before the jury could allocate fault to the truck driver. *Dyer v. Best Pharmacal*, 118 Ariz. 465, 467, 577 P.2d 1084, 1086 (App. 1978) ("A claim of negligence per se does not obviate the need . . . to show that the [non-party at fault's] actions were the proximate cause of [the] injuries."). Under these facts, even if the jury found the truck driver was negligent per se, it could have found the State was the ultimate cause of the crash by failing to erect a median barrier.

¶49            The jury was properly instructed on the allocation of fault. The verdict form properly required the jury to allocate fault between the State, Sumpter and the truck driver, including blanks for "the relative degrees of fault" for each and adding that "[i]f a party listed below is not at fault, put a zero (0) on the percentage line for that party." After hearing trial evidence, argument from counsel and deliberating, the jury put a zero on the percentage lines for Sumpter and the truck driver. This court "'presume[s] that jurors follow instructions,'" meaning the jury considered the possible fault of the listed non-parties in reaching its verdict. *State v. Dann*, 205 Ariz. 557, 570, ¶ 46, 74 P.3d 231, 244 (2003) (quoting *State v. Prince*, 204 Ariz. 156, 158, ¶ 9, 61 P.3d 450, 452 (2003)). In the end, this court need not decide the precise reason the jury found the State was at fault and others were not; instead, the inquiry is whether, on

this record, the jury properly could have allocated fault as reflected in the verdict. *See Mullin v. Brown*, 210 Ariz. 545, 551, ¶ 24, 115 P.3d 139, 145 (App. 2005) (discussing that a general verdict will be upheld if evidence on any one count, issue or theory sustains the verdict). Although the jury properly could have made a different fault allocation, given the conflicting evidence and credibility determinations involved, the superior court did not abuse its discretion in denying the State's motion for new trial based on the jury allocating no fault to the truck driver.

## CONCLUSION

¶50        Finding no error, the superior court's judgment is affirmed.



Ruth A. Willingham · Clerk of the Court
FILED: MJT